## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

### DAVIS v. GORDON.

#### March 26th, 1891.

1. PRINCIPAL AND AGENT—*Liability—Case at bar.*—Agent can bind principal only by acts within the scope of his authority. Agent employed to effect sale of only one parcel of land, in a specified manner, is a special and not a general agent. Owner is not bound by sale by such agent of corner lots, made without owner's consent, and in his absence and below minimum price fixed by him.

2. AGENCY—*General—Special—Case at bar.*—Advertisement of proposed auction sale of the owner's lots, and the advertisement bill paid by the owner, did not convert the special agency into a general agency, so as to authorize such agent, seven months later, to sell the lots in a manner and at a price different from what was arranged for the auction sale. Nor did the erection of a sign on the lots, showing they were for sale by them, without mentioning the owner's name.

Appeal from decree of the chancery court for the city of Richmond, pronounced on the 6th day of July, 1889, in the suit therein pending, wherein Dr. H. Wythe Davis was plaintiff and Col. John W. Gordon was defendant. The object of the suit was to compel specific performance of a certain contract for the sale and purchase of real estate; which contract was entered into by and between Chewning & Rose, real estate agents, and Dr. H. Wythe Davis, on the 12th of January, 1889, whereby Chewning & Rose undertook, as agents of said John W. Gordon, to sell to said H. W. Davis sixty feet of ground, at the corner of Cary and Linden streets, in the city

of Richmond; and, at the time of the alleged contract, Chewning & Rose executed the following paper:

"Richmond, Va., January 12th, 1889.

Received of Dr. H. W. Davis five dollars, earnest money, on purchase of a lot at northwest corner of Cary and Linden streets, fronting sixty feet on Cary street by a depth of 100 feet, to an alley, for the price of twenty-four hundred dollars; one-fourth cash, balance at six, twelve and eighteen months.

Chewning & Rose,
Agents for John W. Gordon."

It was to enforce this contract that the plaintiff's bill was filed. After setting forth the contract, the plaintiff alleges that, on the —— day of January, 1889, as soon as an examination to the title to said property could be conveniently made, and which was begun at once, an abstract of which is exhibited with the bill, he tendered to the said Chewning & Rose, agent for said John W. Gordon, and afterwards to the said Gordon himself, the sum of $600 in currency, a note for $618, payable to the order of said John W. Gordon, at six months; a note for $636, payable to his order, at twelve months, and a note for $654, payable to his order, at eighteen months, together with a deed of trust conveying said property to secure the payment of the said notes, and demanded of said Chewning & Rose, agents as aforesaid, a deed of general warranty, conveying said property to the plaintiff; that said agents refused to comply with the terms of sale, because, as they alleged, the said John W. Gordon had instructed them not to do so, and the said Gordon also declined said tender and refused to comply with said contract, alleging as an excuse that said Chewning & Rose were not authorized to make said sale; that the plaintiff has fully complied with the terms of said contract on his part, so far as it was proper for him to do without a delivery to him of the deed demanded as afore-

said; and that the plaintiff is now, as he has always been since the making of said contract, ready and anxious to comply with its terms. And the bill charges that the said Chewning & Rose were the agents of said John W. Gordon, and authorized to make said contract of sale. And the prayer of the bill is that John W. Gordon be made a party defendant thereto and required to answer the same, but waiving answer under oath; and that said John W. Gordon be required to specifically perform said contract; and for general relief, &c.

The defendant, John W. Gordon, answered, saying: That the contract for the sale of the lot, which was entered into by said Davis with Chewning & Rose as agents, was entered into without any authority from him to said Chewning & Rose, as his agents, to make such contract or such sale, and denies that he is in any way bound by the same. He says it is true, as alleged in the bill, that said Davis offered to comply with the provisions of said contract, but that respondent declined to allow him to do so, because he repudiated said contract, and considered that he was in no way bound by the same, &c.

Depositions were taken on both sides, and the cause having been regularly matured, came on and was heard on the 6th day of July, 1889, when the said chancery court entered the following decree:

"This day this cause came on to be again heard upon the bill of the plaintiff, the answer of the defendant, this day ordered to be filed by leave of the court, and the general replication thereto, and upon the depositions taken in the cause, and was argued by counsel. On consideration whereof, the court, for reasons appearing in a written opinion filed herein, doth adjudge, order and decree that the said bill be, and the same is hereby dismissed, but without prejudice to any legal rights or remedies the plaintiff may have, and doth further decree that the said plaintiff shall pay to the said defendant his costs in this suit. From this decree the plaintiff obtained an appeal to this court.

*Pollard & Sands*, for the appellants.

*Johnston, Williams & Boulware*, for the appellee.

RICHARDSON, J. (after stating the case) delivered the opinion of the court.

The sole question to be determined is, were Chewning & Rose authorized, as the agents of John W. Gordon, to make the contract in question? The answer to this question depends upon the nature and extent of the authority conferred by John W. Gordon upon Chewning & Rose, it not being denied by the former that the latter were his agents in a limited and restricted sense.

Agencies are commonly divided into two sorts—(1) a general agency; (2) special agency. A general agency properly exists where there is a delegation of authority to do all acts connected with a particular trade, business or employment. On the other hand, a special agency exists where the authority delegated is to do a single act. Thus, a person, who is authorized by his principal to execute all deeds, sign all contracts, or purchase all goods required in a particular trade, business or employment, is a general agent in that trade, business or employment. But a person, who is authorized by his principal to execute a particular deed, or to sign a particular contract, or to purchase a particular parcel of merchandise, is a special agent. Story on Agency, § 17. The same author, in § 18, says: "A person is sometimes (although, perhaps, not with entire accuracy) called a general agent, who is not appointed with powers so general as those above mentioned, but who has a general authority in regard to a particular object or thing; as, for example, to buy and sell a particular parcel of goods, or to negotiate a particular note or bill, his agency not being limited in the buying or selling such goods, or negotia-

ting such note or bill, to any particular mode of doing it. So, an agent, who is appointed to do a particular thing, in a prescribed mode, is often called a special agent, as contra-distinguished from a general agent; and in § 19 it is said: "On the other hand (although this is not the ordinary commercial sense), a person is sometimes said to be a special agent, whose authority, although it extends to do acts generally in a particular business or employment, is yet qualified and restrained by limitations, conditions and restrictions of a special nature. In such a case the agent is deemed, as to the person dealing with him, in ignorance of such special limitations, conditions and restrictions, to be a general agent, although, as between himself and his principal, he may be deemed a special agent. In short, the true distinction (as generally recognized) between a general and a special agent (or, as he is sometimes called, a particular agent) is this: a general agency does not impart an unqualified authority, but that which is derived from a multitude of instances, or in the general course of an employment or business; whereas, a special agency is confined to an individual transaction."

The author, in this concise statement of the law, covers all the ground essential to the proper consideration of every practical distinction that may be taken between a general and a special agency. It is of the utmost importance to carefully discriminate between general agents and special agents, as to the rights and responsibilities, the duties and the obligations, both of principals and agents, as the principles applicable to the one frequently have no application whatever to the other. To perform this task successfully, and with due regard for the rights of all persons interested, it is important to keep constantly in mind what has been already stated—the distinction commonly taken between the case of a general agent and that of a special agent, the former being appointed to act in his principal's affairs generally, and the latter to act concerning some particular object. In the former case, the principal will

be bound by the acts of his agent within the scope of the
general authority conferred on him, although he violates by
those acts his private instructions and directions, which are
given to him by the principal, limiting, qualifying, suspend-
ing, or prohibiting the exercise of such authority under par-
ticular circumstances. But, on the contrary, in the case of a
special agency, if the agent exceeds the special and limited
authority conferred on him, the principal is not bound by his
acts, but they become mere nullities, so far as he is concerned;
unless, indeed, he has held him out as possessing a more en-
larged authority. Story on Agency, § 126, and authorities
there referred to; and among them, 2d Kent's Com., sec. 41,
pp. 620, 621 (4th Ed.); 3d Chitty on Com. & Manf., 198; Smith
on Mercantile Law, 58–62 (2 Ed.); *Fenn* v. *Harrison*, 3 T. R.,
757; *Howard* v. *Braithwaite*, 1 Ves. & B., 209, 210; *Whitehead*
v. *Tuckett*, 15 East, 408.

The ground of this distinction, says Story, is the public
policy of preventing frauds upon innocent persons, and the
encouragement of confidence in dealings with agents. If a
person is held out to third persons, or to the public at large,
by the principal, as having a general authority to act for and
to bind him in a particular business or employment, it would
be the height of injustice, and lead to the grossest frauds, to
allow him to set up his own secret and private instructions to
the agent, limiting that authority; and thus to defeat his acts
and transactions under the agency, when the party dealing
with him had, and could have, no notice of such instructions.
In such cases, good faith requires that the principal should be
bound by the acts of the agent, within the scope of his gene-
ral authority; for he has held him out to the public as com-
petent to do his acts, and to bind him thereby. The maxim
of natural justice here applies with its full force, that he who,
without intentional fraud, has enabled any person to do an
act, which must be injurious to himself, or to another inno-
cent party, shall himself suffer the injury rather than the

innocent party, who has placed confidence in him. The maxim is founded in the soundest ethics, and is enforced to a large extent by courts of equity. Of course, the maxim fails in its application, when the party dealing with the agent has a full knowledge of the private instructions of the agent, or that he is exceeding his authority. Story on Agency, § 127.

The same author, after stating the exemplification of the rule in the civil law, as to the distinction between a general and a special agency, says: "The illustrations in our law of the same distinction between general agents and limited or special agents, may be familiarly seen in the common case of factors known to be such. They possess a general authority to sell; and if in selling they violate their private instructions, the principal is nevertheless bound. And it makes no difference, in a case of this kind, whether the factor (if known to be such) has been ordinarily employed by the principal to sell, or whether it is the first and only instance of his being so employed by the principal to sell; for still, being a known factor, he is held out by the principal as possessing, in effect, all the ordinary general authority of a factor, in relation to the particular sale. But if a common person, not being a factor, should be authorized to make a like sale, and he should violate his private instructions, and deviate from his authority in the sale, the principal would not be bound. In such a case, no general authority is presumed, and he who deals with such an agent, deals with him at his own peril; for, in such a case, the principal has not held the agent out as a general agent.

However apt the above illustration may be in the case of factors known to be such, the doctrine applicable to that class of agents can have but a limited influence in illustrating the case of agents who, as in the present case, are real estate brokers, as a factor differs from a broker in certain important particulars. Real estate brokers negotiate the sale or purchase of real estate. * * * Their powers are ordinarily limited to

negotiating a contract, and do not extend to the execution of a contract of purchase or sale, and in this respect they differ from merchandise brokers. The broker may be employed orally or by writing; and he may be authorized to make a contract for the sale or lease of real estate which will be sufficient under the statute of frauds, by an instrument not under seal, and even by parol; but he may not attach a seal to the instrument made under such an authority. An authority "to close the bargain," is not an authority to sign the names of the principal to a contract of sale. 3d Wait's Action on Defences, 286–7, and authorities cited.

The same author, discussing the case of factors and commission merchants, at p. 289, says: "A factor is an agent employed to sell goods consigned or delivered to him by or for his principal for a commission, usually called a factorage or commission. Hence, he is often called a commission merchant or consignee; the goods received by him for sale are called a consignment. There seems to be no substantial difference in law between a factor and a commission merchant. The words are ordinarily used interchangeably. A factor, as we have seen, differs materially from a broker. He is intrusted with the possession, management and disposal of the consigned property. He may sell in his own name and may receive and enforce payment. And in Story on Agency, after defining the terms "broker" and "factor" in substantially the same language as that employed in 3d Wait, in § 28, *et seq.*, it is said: "Properly speaking, a broker is a mere negotiator between the other parties, and he never acts in his own name, but in the names of those who employ him. Where he is employed to buy or sell goods, he is not intrusted with the custody or possession of them, and is not authorized to buy or to sell them in his own name. He is strictly, therefore, a middle-man, or intermediate negotiator between the parties; and for some purposes (as for the purpose of signing a contract within the statute of frauds) he is treated as the agent of both parties.

Hence, when he is employed to buy and sell goods, he is ac-
customed to give to the buyer a note of the sale, commonly
called a sale note, and to the seller a like note, commonly
called a bought note, in his own name, as agent of each, and
thereby they are respectively bound, if he has not exceeded
his authority. Hence, also it is, that if a broker sells the
goods of his principal in his own name (without some special
authority to do so), inasmuch as he exceeds his proper au-
thority, the principal will have the same rights and remedies
against the purchaser, as if his name had been disclosed by
the broker."

"It has been already suggested," says the author, "that a
broker is, for some purposes, treated as the agent of both par-
ties. But primarily he is deemed merely the agent of the
party by whom he is originally employed; and he becomes
the agent of the other party only when the bargain or contract
is definitively settled, as to its terms, between the principals;
for, as a middle-man, he is not intrusted to fix the terms, but
merely to interpret (as it is sometimes phrased) between the
principals."

"The character of a broker is also sometimes combined in
the same person with that of a factor. In such cases we should
carefully distinguish between his acts in the one character and
in the other; as the same rules do not always apply precisely
to each.  *  *  *  *  A factor differs from a broker in some
important particulars. A factor may buy and sell in his own
name, as well as in the name of his principal. A broker, as
we have seen, is always bound to buy and sell in the name of
his principal. A factor is intrusted with the possession, con-
trol, and disposal of the goods to be bought or sold, and has
a special property in them, and a lien on them. A broker, on
the contrary, usually has no such possession, management,
control, or disposal of the goods, and consequently has no such
special property or lien."

Guided by these principles, we must turn to the evidence in

the cause in order to determine whether Chewning & Rose, as agents of John W. Gordon, had authority to make the contract of sale in question, and to bind Gordon thereby. They insist that they were his general agents, and that they had full authority from him to make the sale and to bind him thereby. He, on the other hand, contends that they were merely special agents, with limited authority, and that he never delegated to them any authority to make the contract of sale sought to be enforced in this suit, nor to make any sale except subject to his approval.

In the court below, the learned chancellor, Fitzhugh, dismissed the plaintiff's bill, on the ground that there was an irreconcilable conflict in the testimony as to the extent of the authority delegated by Gordon to Chewning & Rose as agents; and that there was such conflict, he stated, that it would be a waste of time to show in detail, as it was *apparent on the face of the depositions.*

In the light of the evidence in the cause, the conclusion arrived at by the chancellor is, in our opinion, undoubtedly the correct one. The following facts may be stated as either undisputed, or established by such an overwhelming weight of evidence as to render any contention to the contrary absurd. The property in controversy is part of a lot of land commencing at the northwest corner of Cary and Linden streets, extending west one hundred and twenty feet, fronting on said Cary street, and extending back one hundred feet to an alley. The appellee, John W. Gordon, purchased the property, on or about the 1st of March, 1887, at an auction sale conducted by Chewing & Rose, real estate agents, and was thus bought for speculation; and having been so bought, the purchaser, Gordon, said to Chewning & Rose, "it is for sale again," and expressed a desire that they would sell it; but no definite price was then fixed upon the property. Chewning & Rose had before this sold other properties for Gordon, and they had in each case, before closing the contract, submitted

the offer to him for his approval or rejection. Gordon had received several proposals to purchase the corner lot, and for as much as forty feet on the corner, but always declined to sell the corner first, and was repeatedly and urgently advised by Chewning & Rose not to sell the corner first. They frequently said to Gordon they could sell the corner lot for a good price at any time, and more than once mentioned offers by parties who, for the sake of securing the corner lot, would also buy the next one or two lots to it. And they (Chewning & Rose) represented that the purchaser might put up a grog-shop there and ruin the prospects of the remaining property, and that they must make the corner lot sell the others.

Not very long after the purchase of this property by Gordon, the opposite or southeastern corner of Cary and Linden streets was mentioned in the city newspapers as a desirable site for the erection of the proposed Clay Ward market-house, and a discussion of the subject in the papers about that time had the effect of bringing this property into favorable notice, and the subsequent action of the city council (presently to be more particularly referred to) greatly stimulated the demand therefor. The proposed erection of the Clay Ward market met with considerable opposition, and for some months the discussion of the subject seemed to cease, and the result was a lull in the demand for property in the immediate neighborhood of the proposed site for the new market-house. During this period, in the summer of 1888, at the instance and by the persuasion of Chewning & Rose, Gordon was induced to let them try this property at public auction; consequently the property was advertised to be sold in lots of twenty feet each, fronting on Cary street. A few days prior to the day appointed for the auction sale, Gordon had a conference with Chewning & Rose in order that they might be informed as to the *mini mum* prices at which the lots would be allowed to go at auction, and on this, as on other occasions, they advised Gordon either to sell the property as a whole or to first put up

the lots farthest from the corner. Accordingly a rough sketch or diagram was made, dividing the property into six lots of twenty feet each, and several scales of prices were suggested and made—some of them by Mr. Rose, of the firm of Chewning & Rose, and some by Gordon, in which the prices varied from $55 per foot for the corner lot to $30 for the lot most remote from the corner, the object being to arrive at a price in the aggregate for all the lots, the lowest scale which Gordon agreed to accept making the aggregate price for all the lots about forty-five hundred dollars, the lowest price per foot being $30, which was for the lot farthest from the corner, which was to be first put up.

Very few people attended the proposed auction, and Mr. Rose, who was the auctioneer of the firm of Chewning & Rose, declined to offer the property at auction, saying he would not put up the property; that he knew the crowd, and that every would-be buyer wanted the corner lot, which they were determined not to sell first.

From the day of the proposed auction sale until the 12th day of January, 1889, the date of the alleged contract of sale by Chewning & Rose, agents for Gordon, a period of some seven months, the latter agreed with the former upon no price for the lots in question; but during that period he several times conferred with them about the real estate market, and asked if they had any offer to submit for these lots.

Thus the matter stood until the 7th day of March, 1889, on which day John W. Gordon left Richmond for North Carolina; and on the same day, but after Gordon left the city, there was a meeting of the common council of the city of Richmond, at which a resolution was unanimously adopted fixing the location of the Clay Ward market at a point very near the property in question. While in North Carolina, Gordon received telegrams making him offers for this property, which induced him to believe that his property had suddenly become greatly in demand. He was at a point remote from any railroad, but

by putting himself to some trouble he secured certain Richmond papers, and, on searching them, found the action of the common council above referred to. He thereupon by wire declined the offers made him for his property, and at once returned to Richmond, where he arrived on Sunday, the 13th of March, and after his arrival was informed that in his absence Chewning & Rose had entered into a contract of sale with Dr. H. W. Davis, by which they undertook to sell sixty feet of the Cary street property, commencing at the corner, at $40 per front foot. This action was taken by Chewning & Rose in the absence of and without conferring with Colonel Gordon, and, of course, without his consent. The next morning, Monday, the 4th, as soon as he could reach their office, he informed them that he would not ratify the sale; that they had made it without authority from him, and requested them to notify the purchasers at once that he would not approve it. Subsequently, on the same day, Chewning & Rose, or one of them, anxious for an adjustment of the matter without further difficulty, requested Colonel Gordon to permit them to propose to the purchaser that if he would take the remaining sixty feet at $35 he (Gordon) would then ratify the sale as to the whole property, and Colonel Gordon agreed that he would do that. Having, on the next day, March 15, ascertained that the board of aldermen had, on the previous evening of March 14th, approved the action of the common council, he went immediately to Chewning & Rose and said to them that if they had made the offer authorized by him on the day before, to withdraw it, and they did so; and Gordon himself went to see the alleged purchaser, Davis, and, failing to see him, left a note at his residence informing him that he would not ratify the sale made to him by Chewning & Rose. Mr. Chewning had informed Colonel Gordon that he (Chewning) had, on Monday, the 14th, notified Dr. Davis of his (Gordon's) refusal to ratify the contract; but Dr. Davis testifies that Chewning had given him no such notification, but had only offered to

sell him the residue of the property at $35 per foot, and that he (Davis) had no notice of such refusal until he received Colonel Gordon's note on Tuesday.

The facts above stated are either undisputed or are not seriously controverted. There are, however, other facts and circumstances, some of which are relied upon by the appellant to show that Chewning & Rose were the general agents of Colonel Gordon, and fully authorized to make the sale in question and bind him thereby; and other facts and circumstances relied on by the appellee, Gordon, to show that Chewning & Rose were his special agents as to the Cary street property, and none other, and had no authority to make the sale in question, nor any sale, except subject to his approval or rejection.

Touching the question thus presented, three witnesses, A. J. Chewning and Edward S. Rose, who constitute the firm of Chewning & Rose, and A. J. Gary, formerly a clerk for Chewning & Rose, depose on behalf of the appellant. There is no consistency in the testimony of any two of these witnesses, nor is the testimony of either one of them consistent with the appellant's theory of the case.

Chewning says that he was authorized by Col. Gordon to sell *thirty feet, or upwards, at* $40 *a foot.* This was on his examination in chief. On cross-examination he says he had authority to sell *thirty feet*, or upwards, at $40, and the whole at *thirty-five dollars* a foot. The witness, Gary, on his re-examination by the plaintiff, says that the instructions of Col. Gordon to the firm were to sell *at least forty or sixty feet at* $40 *a foot;* and that they *did not have authority to sell thirty feet, for instance, as the lots were laid off in twenty-foot lots,* and that they *did not have authority to sell less than two or three lots of twenty feet each;* while the witness, Rose, on his cross-examination, says that they had authority to sell the *corner lot* at $30, *meaning,* as he says, *by the corner lot, twenty feet;* thus showing a very wide discrepancy between the members of the firm of

Chewning & Rose, and between each of them and their former clerk, who was in their office for a considerable length of time while they had this property for sale, and was cognizant of what transpired there in respect to the dealings in regard to this property. We therefore see, as respects the authority of Chewning & Rose to sell, Mr. Chewning asserting authority to sell *thirty* feet, but *admitting that he had none to sell less than thirty feet;* Mr. Gary claiming that they had authority to *sell at least forty* feet, but not less than that; while Mr. Rose claims that they had authority to 'sell *as little* as twenty feet.

Again, Mr. Chewning says that he never advised Col. Gordon not to sell the corner lot first, but, on the contrary, advised him to do so. Mr. Rose says he does not recollect, but he very probably did so advise him; and Mr. Gary says, positively and without hesitation, that *he had frequently heard Mr. Chewning,* certainly, and he *thinks Mr. Rose also,* advise Col. Gordon *not to sell the corner lot first;* thus again exhibiting their inconsistencies of statements. Mr. Chewning again says, that Col. Gordon never mentioned- any special terms upon which the property was to be sold, but said, "upon the usual terms;" and Mr. Rose says that no price or terms were ever fixed by Col. Gordon, except when the auction sale was proposed, and that they were then fixed with reference alone to the proposed auction sale. What the "*usual terms*" are, the record does not inform us, nor did the plaintiff (the appellant) in any way attempt to show what the "*usual terms*" are. Surely there can be no reasonable pretence for claiming authority to sell privately half of these lots, including the corner, at a price and upon terms admitted to have been arranged with reference to the proposed auction sale alone, and especially as Col. Gordon had determined, at the urgent solicitation of Chewning & Rose, to sell the property as a whole, or to sell first the lots farthest from the corner, and when they had given such excellent reasons for so doing, and when the sale in question was made six months after the time

fixed for the auction sale, and with reference to which *alone*, the only price ever agreed upon was fixed by Col. Gordon. If no price was ever fixed at any other time, or for any other purpose, as admitted by Mr. Rose, why was not the arrangement as to the proposed auction sale carried out in other respects? Why did not Chewning & Rose sell the property as a whole, or sell first the lots most remote from the corner? Can there be any question as to the fact that Col. Gordon never authorized the sale in the manner, on the terms, or at the price set forth in the contract sought to be enforced in this suit? We think not. It follows, therefore, that the sale made by Chewning & Rose to Dr. Davis was without authority from Col. Gordon, and he is not bound thereby. Chewning & Rose claim that they were the *exclusive* agents for the sale of these lots, and yet it is established by indubitable proof, and they admit that the same property was in the hands of E. A. Catlin and other real estate agents, to whom Col. Gordon had delegated precisely the same authority as that conferred upon Chewning & Rose, and that was to watch the real estate market, hunt up and negotiate with proposed purchasers, and to submit any offers made to him for his approval or rejection. And Mr. Chewning says, if any other agent had brought Col. Gordon a satisfactory offer he supposes he would have accepted it. The forgetfulness or inaccuracy of Mr. Chewning is well illustrated in his denial, on cross-examination, that he had ever before sold any property for Col. Gordon, when in his own deposition, Col. Gordon proves that he had made several sales for him before, and actually produced and filed the account of such sales furnished him by Chewning & Rose. And again, the same fact is illustrated by Chewning's statement (before referred to) to Col. Gordon that he had notified Dr. Davis of his (Gordon's) refusal to ratify the sale in question, when Dr. Davis testifies that Chewning gave him no such information, and that the first notice he had of the fact was when he received Col. Gordon's note a day later.

Mr. Catlin testifies as to the time and place of an interview between Chewning & Rose, Col. Gordon and himself, and states in detail what was said. Col. Gordon at first did not, it is true, remember the interview, but when it was called to his attention he did remember it, though with commendable candor he states that he does not remember what occurred at it. Chewning & Rose tried to disprove the interview by showing that Mr. Catlin came to their office, when the interview took place, on business other than anything connected with Col. Gordon's affairs. But Mr. Catlin, in the outset, had said that he went to the office about another matter; but he testifies that while there Col. Gordon came in, and that Chewning & Rose then, in his presence, tried to induce Col. Gordon to withdraw this property from his hands, which he would not do. And Mr. Catlin is sustained by Col. Gordon, who, though not recollecting the particulars of the interview above referred to, does testify that soon after the discussion commenced in the newspapers as to the site for the Clay Ward market, he received through Mr. Catlin an offer of $35 per foot for the whole property, and that he promptly refused the offer; that Catlin then asked him to name his price, which Gordon declined to do, saying he did not care to name any price just then, but that he (Catlin) might submit any *bona fide* offer above $40 per foot for the whole property; that he subsequently communicated the particulars of this interview to Chewning & Rose, and told them that he had declined what he considered, or what might be considered an offer of $35 per foot for the whole property, and that they said he had done right. And Col. Gordon testifies that this offer by Catlin was not referred to Chewning & Rose for the determination as to whether it should be accepted or not, as intimated in the deposition of Mr. Gary, that he had positively declined the offer before saying anything to them, and only mentioned the offer to them that they might know that the property was being enquired for.

In addition to the depositions of Mr. Catlin and of Col. Gor-

don himself, on behalf of the latter, the depositions of Robert Lecky, Jr., and G. B. Picot, clerks in Col. Gordon's office, were also taken. Mr. Lecky testifies that he had heard Mr. Gary (who testified on behalf of the plaintiff) tell Col. Gordon that he had frequently heard Chewning & Rose advise him not to sell the corner lot first, and not to sell the property except as a whole.

Mr. Picot testifies that he heard Mr. Gary tell Col. Gordon that he had frequently heard him tell Chewning & Rose that he would not sell this property except as a whole, or unless they sold the lots furthest from the corner first. Now, Mr. Gary was a witness introduced on behalf of the plaintiff, and on his cross-examination, the proper foundation having been laid, he was asked if he had not made the statements testified to by Lecky and Picot, and he denied having made them.

It is obvious, taking the testimony of Gary, as it should be taken, in connection with that of Lecky and Picot, who distinctly, clearly and directly state what Gary said in their presence and hearing, that the weight of evidence is very greatly in favor of the appellee, as to the manner in which Col. Gordon required this property to be disposed of. In other words, the evidence clearly establishes, that the property was to be sold as a whole, or the lots furthest from the corner were to be sold first.

Moreover, the plaintiff (appellant here) invoked the aid of established custom, and to that end took the depositions of several real estate agents, but from them he derived no comfort. On the contrary, they, with possibly one exception, testify directly and positively that, under similar circumstances, they would by no means have felt authorized to close a sale without conferring with the owner or principal.

And further, in order to uphold his claim that Chewning & Rose were the general agents of Col. Gordon, were by him clothed with ample authority, and held out to the public as such, the appellant places much reliance on the fact that the

proposed auction sale was advertised in one or more of the newspapers of the city of Richmond, and that the bill for advertising was presented by Chewning & Rose to Col. Gordon, and was paid by him. Certainly he paid the bill, for at their instance he had authorized Chewning & Rose to buy the property at public auction, and although no sale was thereby effected, he was responsible for the expense thus incurred, especially as there was no special contract to the contrary.

But the question presents itself, if Chewning & Rose were the general agents of Col. Gordon, and as such, were clothed with full power and authority to make the sale and bind him thereby, without submitting their action to him, then why did they not arrange for the proposed auction sale without consulting him? Why was it necessary to submit their proposition for a sale at auction to him, to urge his acceptance of same, and to arrange beforehand, under his personal superintendence and direction, the terms and *minimum* price at which *he* would permit the property to be sold at such auction? The day set for the proposed auction was more than seven months prior to the contract of sale here in question. How, then, can it be claimed with the least degree of consistency, that an authority that was insufficient to authorize Chewning & Rose to arrange for and sell the property at auction, was yet ample, seven months later, to authorize a private sale in a manner and at a price wholly different from what was arranged for the contemplated auction, and that was, not only never authorized by Col. Gordon, but was forbidden by him. Col. Gordon's name was not even mentioned in the advertisement; and, as before stated, it had reference only to the proposed auction sale and had, and could have, no reference or application to anything else whatever.

The appellant also relies upon the fact, that Chewning & Rose erected on the property in question their "Board," on which was printed, in large letters, something like this: "For sale," or, "This property for sale, apply to Chewning & Rose,

agents," &c., but not mentioning the name of Gordon, the owner. If acts such as these, the mere devices of real estate agents, intended to attract notice and entice bidders, constitute holding out one to third persons, or to the public at large, by the principal, as having a general authority to bind him in a case like the present, then, indeed, is the condition of the property-holder a most deplorable one, for he is, at the mere will and pleasure of any one of the army of land agents, liable at any time to have his estate administered upon, and to be sold out of house and home. If real estate agents may, by their own interested acts, thus hold themselves out to third persons, and to the public, then, if a man employ such an agent to sell at auction a particular piece of property, or even a lot of old rubbish, the agency may, though never so special and limited, be continued and enlarged by acts of the agent alone, such as are relied on in the present case, who can at pleasure dispose of any man's estate, on terms and at a price to suit himself. The law is as above laid down, and it tolerates no such monstrous doctrine. The true principle is, as already stated, that if a person is held out to third persons, or to the public at large, by the principal, as having a general authority to act for and to bind him in a particular business or employment, it would be grossly unjust and tend to sanction the most unmitigated frauds, to allow such principal to set up his own secret instructions to the agent, limiting that authority; and thus to defeat his acts and transactions under the agency, when the party dealing with him had, and could have, no notice of such instructions. But while sound public policy thus encourages freedom and confidence in the dealings with agents, yet the law jealously guards against unauthorized acts, and promptly rejects, as odious, the idea that an agent may, at his will, act either without or in excess of the authority conferred on him, and bind his principal thereby. Hence the rule is directly the reverse of that just laid down, when, as in the present case, a special or particular

agent, who is employed in one single transaction; for in such case, it is the duty of the party dealing with the agent, to ascertain the extent of his authority; and if he does not, he must abide the consequences. Such is the condition of the appellant in this case. He blindly confided in, and contracted with, agents who acted without authority from their principal.

Then, looking at the case in the light of all the evidence, it is clear that Chewning & Rose were but special agents, with limited authority, as to the one particular piece of property; that they not only failed to communicate with Col. Gordon by telegram, when they could readily have done so, as others did, but neglected and refused to obey his positive instructions to them, and of their own will, without authority from him, undertook to sell a portion of the property, including the corner lot. How, then, was it possible for the learned chancellor below to arrive at any other conclusion than that announced in his decree.

It only remains to add, that the theory advanced by the appellant must necessarily fall to the ground, for want of that evidence essential to show that Chewning & Rose had authority to make the contract sought to be enforced in this suit. The contract attempted to be set up, was made by the appellant with Chewning & Rose, and was signed by the latter as agents for the appellee, by whom it was not authorized, and it is, therefore, without validity, and is incapable of enforcement. The specific execution of a contract for the sale of real estate rests in the sound legal discretion of the court. The plaintiff must establish the contract and prove it as stated in the bill, and the contract must be certain, fair and just in all its parts. *Haskins* v. *Agricultural Fire Ins. Co.*, 78 Va., 707. In the present case, all these essentials are wanting, and therefore the appellant has no case.

The legal proposition asserted by the counsel for the appellant, that the owner of lands may by parol authorize another

to make a contract for the sale thereof, as was held in *Yerby* v. *Grigsby*, 9 Leigh, 387, seems to be established law; but it is of no force in the present case, as here there was no *authority*, either by parol or otherwise, to make the contract. For the reasons stated, we are clearly of opinion that the decree appealed from is without error, and that the same must be affirmed

DECREE AFFIRMED.