# CHARLESTON.

THOMAS & MORAN v. KANAWHA VALLEY TRACTION COMPANY.

Submitted November 7, 1911.    Decided December 9, 1913.

1. CORPORATIONS—*General Manager—Powers.*
    The powers of the general manager of a corporation are, as a general rule, coextensive with the business entrusted to him, and he has apparent authority to bind the corporation by all contracts reasonably incident to that business, including power and authority to modify, release, waive, extend or substitute a new contract for a contract which he had authority to make.    (p. 379).

2. CONTRACTS—*Well-Drilling Contract—Construction.*
    A contract to continue to drill a water well to such depth as that water may be supplied therefrom, being pumped by a particular pump, at a minimum flow of twenty gallons per minute, and conditioning payment of an amount agreed as the balance due the contractor for boring the well to the first depth, and the price per foot for sinking the well deeper on performance of that contract, does not amount to a guarantee on the part of the contractor to produce a well of the desired caliber, but properly construed is an agreement to drill to such reasonable depth as may be required to produce such well, notwithstanding such contract provides that the owner is to have two weeks after completion of the well to test the capacity of the well.    There is substantial performance of such contract, entitling the contractor to the stipulated price, when the well has been drilled such reasonable depth.    (p. 381).

3. WORK AND LABOR—*Well-Drilling Contract—Partial Performance—Amount of Recovery.*
    When a contract has been only partially performed, or performed in an incomplete or inferior manner, if the contract is apportionable, and the labor done and material furnished is appropriated by the other party to the contract, he is liable to the contractor for what such labor and material are reasonably worth, to be determined by the contract price, less payments, damages sustained, and what it would cost to complete the contract.    (p. 382).

4.   Rulings on Instructions.

   In giving and refusing instructions to the jury contrary to these principles the court below committed reversible error.   (p. 383).

Error to Circuit Court, Kanawha County.

Action by Thomas & Moran against the Kanawha Valley Traction Company.   Judgment for defendant, and plaintiffs bring error.

*Reversed, and new trial awarded.*

*Payne & Payne,* for plaintiffs in error.

*Chilton, MacCorkle & Chilton,* for defendant in error.

Miller, Judge:

   The judgment below on the verdict of the jury was that plaintiffs take nothing by their action, and that defendant recover its costs.   To this judgment error is brought by plaintiffs to this court.

   The action was assumpsit, upon the common counts, and also upon a special count, counting upon a contract in writing between plaintiffs and defendant for the drilling of a water well.   The contract pleaded, dated June 22, 1907, recited under a whereas, a contract of June 2, 1906, between the same parties, for the drilling of a well, the drilling thereof under that contract to the depth of 356 feet, and failure to find water in sufficient quantities to supply the wants and purposes for which said well was intended; and in consideration of the premises, and the sum of one dollar, cash in hand paid, and acknowledged, plaintiffs, parties of the first part, thereby agreed to continue to bore the well "to such a depth as that water be supplied from said well being pumped by a pump belonging to the said party of the second part, and now located in said well to produce a minimum flow of twenty gallons per minute", and in consideration thereof defendant agreed to pay the parties of the first part $234.00, and for every additional foot bored $1.50 per foot, "the said sum of $234.00 and the additional sum at the rate of $1.50 per foot is to be paid by the party of the second part to the said parties of the first part when the well is completed and is bored to a sufficient depth to furnish twenty gallons per minute under the conditions set out aforesaid."   And further "that the said

sum of $234.00 is in full settlement of all the work done by the said parties of the first part on said well up to the date of this agreement, and said price of $1.50 per foot is to be paid for each additional foot said first parties bore said well after the date of this agreement.''

The first parties thereby further agreed ''to allow the said party of the second part at least two weeks after the completion of the said well to test the same to ascertain whether or not the well has a capacity,—being pumped by the pump aforesaid—of twenty gallons per minute; and should, after the end of the two weeks' test as aforesaid, it be found that the well has a sufficient capacity under this contract, then the $234.00 and the additional sum of money at the rate of $1.50 per foot shall become due and payable.''

The last provision of the contract provided that it should supersede and take the place of that of June 2, 1906, referred to. Other provisions thereof are unimportant in the consideration of the case.

The special count avers, in substance, that within a reasonable time, and as early as possible after making this contract, plaintiffs commenced the work of drilling and boring said well and were ready and willing to comply with the terms and provisions of the contract, but that before they were able to get the work under way they were stopped by defendant, and were not permitted to continue therein according to the contract. They aver that at the time of making the contract the sum of $234.00 was then due them for drilling the well to the depth of 356 feet, according to an account then stated between the parties; wherefore they allege they are entitled to recover that sum, laying their damages at $800.00.

In the bill of particulars filed with the declaration defendant is charged, as follows: ''June 22, 1906. To agreed amount due for drilling Well at Edgewood Park, 156 feet, at $1.50 per foot, $234.00. To drilling three wells on the same property, 80 feet each, at $1.50 per foot, $360.00. Total $594.00.''

On the trial the issues tendered by plaintiffs were: First, that the performance of the written contract was waived or changed by agreement, plaintiffs and defendant substituting for that contract to drill the well deeper a verbal contract to drill three wells surrounding the first, to a depth of 80 feet

each, at the same price per foot, and that plaintiffs were entitled to recover the $234.00, the balance due them for drilling the original well, regardless of the written contract. Second, that upon the new or modified contract they were entitled to recover the price for drilling the three surrounding wells at the rate of $1.50 per foot, and without reference to the provisions of the contract pleaded in the special count. Third, that in any view of the case they were entitled to recover the value of their work to defendant.

Defendant's theories, which the court below seems to have adopted, were: First, that the three additional wells were drilled not outside of but under the terms of the contract, or as modified by the new part, and under and subject thereto, and as a tender of compliance therewith by plaintiffs, not agreed to or accepted by defendant, Alexander, general manager, having had no authority to change or waive performance of the original contract. Second, that the contracts pleaded, by proper construction, amounted to a guarantee upon the part of the plaintiffs of a supply of water equal to that mentioned in the contract, and that payment of the $234.00, balance for drilling the original well to the depth of 356 feet, as well as the price per foot for drilling the well deeper, or for drilling the three additional wells, being conditioned upon plaintiffs finding water and furnishing a well of the capacity or caliber mentioned in the contract.

On the trial the original contract of June 2, 1906, was not produced. Failure to produce it is excused by plaintiffs because of its loss. Whether it was executed in duplicate and one part taken by defendant does not appear; but the fact is that it was not produced by either party on the trial. Whether that contract contained terms of guaranty on the part of plaintiffs to produce a water well of the desired caliber is not shown. If it had been produced it might have shed some light on the proper construction of the later contract of June 22, 1907.

In support of plaintiffs' theory of a new contract governing the drilling of the three additional wells and shooting and draining them into the original well, the substance of their testimony is: That when they were about to start the work of drilling the original well deeper, inquiry was made of Alexander, general manager, as to what he would do if salt

water should be struck in going deeper; that they expressed to him their opinion that if the original well was drilled much deeper they would strike salt water. He answered that he did not know what to do. They say they advised the drilling of three wells around the original one, then to shoot them all together, draining the shallower wells into the original one; that after thinking the matter over Alexander agreed to this plan, saying that this called for a new contract, which he agreed to have prepared and signed, but never did, but that he told them in the mean time to go ahead with the work of drilling the three wells. They swear, and Alexander admits, that they were engaged in drilling these three wells several weeks; that he was present frequently, every two or three days, while the work was going on; made no objection; acquiesced therein; that he was there when they completed the wells, and when the wells were connected up with the pump; that the pump was kept going from about noon of the day the wells were completed to at least four o'clock in the afternoon when they left to go home; that Alexander expressed his opinion that day that they were going to have all the water they needed out of these wells.

As to what occurred between plaintiffs and Alexander, general manager, respecting the drilling of the three additional wells, the latter's testimony is: "Mr. Thomas and Moran came to the office to see me about drilling the well under this contract, drilling it deeper, and stated that they were not sure that their machine would drill deeper; also that they were afraid if they would run deeper they would strike salt water and ruin the well, and wanted to know what I thought about drilling three wells and shooting into this well, to get the full capacity. I told them I didn't know anything about drilling wells, I had employed them on account of their knowledge of the work, and I would have to leave that matter to their judgment, but that this contract was drawn and binding, and I could not waive it. If they did drill three wells in that manner that I could not waive any of the terms of this contract, but what we wanted under the contract was that amount of water, and if they obtained it in some other manner that we would then be satisfied."

What the exact capacity of the wells is, is not shown, but

it is practically conceded by plaintiffs that they did not hold
out for twenty gallons per minute.   One of the plaintiffs
swears the well would produce twenty gallons per minute, but
he did not know how long it would hold out at that rate.
After completion of the wells defendant took charge of them,
as its only source of water supply, and has continuously used
them since then, though they do not furnish sufficient water to
satisfy the requirements of its business.   Sometimes, Alexander
says, water from the creek was pumped into them.   The evi-
dence shows that the land where these wells are is located high
up, far above the line reached by water from the city water
works, and where water is hard to obtain.

There is no evidence of any demand by defendant on plain-
tiffs after the wells were completed and taken charge of by it,
to drill the wells deeper.   The only evidence we find on the
point is that when plaintiffs made demand for payment
Alexander answered that the wells were not satisfactory.
Alexander swears that before plaintiffs began the drilling of
the three additional wells he made several demands on them
to drill the first well deeper.

The first question presented is, was there an independent
contract for the drilling of the three additional wells?   The
evidence of plaintiffs tended strongly to show such a contract,
assuming that Alexander, general manager, had authority to
make it.   This evidence, we think, was sufficient to have
carried that question to the jury.   This, plaintiffs attempted
to do by their instructions to the jury Nos. 1 and 2, but the
court modified them, and gave them as modified, over plain-
tiffs' objection.

Both plaintiffs swore that after the agreement was made to
drill the three additional wells Alexander said this would call
for a new contract, which he would have prepared and signed,
but which he never did.   But did Alexander have authority
to make a new or modified contract?   He admits authority to
make the original contract.   The business of contracting for
and having the well or wells drilled, he concedes, had been
committed to him by the company.   No by-law or resolution
was offered in evidence defining or limiting his powers as
general manager.   The general rule is, that the powers of a
general manager or agent are coextensive with the business

entrusted to him, and that he has apparent authority to bind the corporation by all contracts reasonably incident to that business, the reason for the rule being that the corporation by the very act of appointing such general manager holds him out to the public as one authorized to bind it by contracts necessary in the prosecution of its business. 2 Thompson on Corporations, sections 1575, 1576. Incident to such apparent power and authority, it has been held by high authority, that such general manager has power to modify or release a contract which he has power to make, or to waive performance, or extend the time of performance, or substitute a new agreement. 2 Thompson on Corporations, section 1581, citing in notes 74, 75, and 76, *Indianapolis Rolling-Mill* v. *St. Louis, &c. R. Co.,* 120 U. S. 526; *Burley* v. *Hitt,* 54 Mo. App. 272; *Nichols* v. *Scranton Steel Co.,* 137 N. Y. 471, 33 N. E. 561; *Hudson River, &c. R. Co.* v. *Hanfield,* 55 N. Y. S. 887; *White* v. *Taylor,* 113 Mich. 543, 71 N. W. 871. And under such general power it was held that a general manager, with authority to supply water to third persons, had authority to bind his corporation by a contract which differed to some extent from the corporation's particular form for contracts, where the other contracting parties had no knowledge that the manager's authority was limited to making of contracts in such particular form. 2 Thompson on Corporations, section 1582, a section covering general illustrations, citing, note 96, *Alston* v. *Broadus Cotton Mills,* (Ala.) 44 So. 654. And in our case of *Bank* v. *Lumber Co.,* 70 W. Va. 558, 570, point 7 of the syllabus, we held instruction No. 6 bad, because it attempted to make the issue turn on the question of actual authority or ratification of unauthorized action. The court, by Judge POFFENBARGER, there says: "Evidence of apparent authority, sufficing to sustain the issue, was wholly ignored by it. To say the least, it would have been misleading in that it failed to define or extend ratification so as to include estoppel, based upon evidence of apparent authority." "If a general agency exists, it is prima facie co-extensive with the requirements of the business at the given time and place." *Coles* v. *Jefferson Ins. Co.,* 41 W. Va. 261. A general agent, may, as a general rule, do everything a principal may do. *Kramer* v. *Blair,* 88 Va. 456. As is said in *Davis* v. *Gordon,* 87 Va. 559, 563-4,

"In the former case, (that of a general manager) the principal will be bound by the acts of his agent within the scope of the general authority conferred on him, although he violates by those acts his private instructions and directions."

In the case at bar we have as additional evidence of the power of the general manager, to make or ratify the new or modified contract, and of the ratification thereof by the corporation, the fact, admitted, that Alexander was present while the work of drilling the new wells was going on, and acquiesced therein, and that his company thereafter accepted the work of the plaintiffs, and appropriated the wells to its own use, without demand upon the plaintiffs for further performance of the contract.

The next question is, assuming that the contract for drilling the three wells was a mere modification of the written contract, otherwise subject to its terms and provisions, was there express or implied warranty by the plaintiffs to produce a well or wells of the desired caliber? We do not find in the contract any such express warranty. The testimony of the plaintiffs in some parts might at first glance seem to admit such warranty in the written contract, and as putting that construction thereon, but we do not think their evidence should be construed as making such admission. They were evidently referring to the provisions of the contract itself. What they evidently meant in their testimony was that they agreed, according to the language of the contract, to drill to such a depth as that water might be supplied from said well at the minimum rate of twenty gallons per minute, and that they were not to be paid until they had drilled the well to such a depth. They evidently meant to say no more than the contract says. But does the contract specifically guarantee the quantity of production, or say that plaintiffs are to be paid nothing for their labor unless water be found in the quantity desired? They might have so stipulated, but did they do so? It would certainly have been a very hazardous and foolhardy contract to make, situated as these wells were, and one which they could have had no assurances of their ability to literally perform. Did they in fact, or intend to contract, that if they got a well or wells with one-half or three-fourths or nine-tenths the capacity called for, defendant might appropriate them and

take the benefit thereof, without liability to plaintiffs for any part of the contract price? We can not so interpret the contract. We think the plain meaning of the contract is, that plaintiffs were to continue to drill the well until water in the quantity desired was obtained, provided, such quantity should be found at a reasonable depth, and that defendant had right under that contract to require them to go to such depth, but certainly it could not have required them to go on forever. Reasonable depth to obtain a well of the capacity required was all that could have been demanded. If, and when, such depth was reached, there was substantial compliance with the contract, and unless by the terms of the contract there was a guarantee to produce a well of the quantity desired, and we think there was none in this case, the plaintiffs were entitled to the stipulated price for drilling the well. We think this proposition supported by, 1 Beach on the Modern Law of Contracts, section 294; *Butler* v. *Davis*, 119 Wis. 166; *Bohrer* v. *Stumpff*, 31 Ill. App. 139; *Madden* v. *Oestrich*, 46 Minn. 538; 3 Page on Cont., section 1388; *Holmes* v. *Oil Co.*, 138 Pa. 546.

But whether there was substantial compliance with the contract, assuming that the contract of June 22, 1907, was only modified and still in force, a proper question for the jury on all the evidence, entitling plaintiffs to full compensation, or only part performance, with substantial and beneficial results appropriated by defendant, entitling them to recover only the value of the work and labor performed on the wells drilled to the defendant, were questions for the jury. The rule of law in such cases is, that when a contract has been only partially performed, or performed in an incomplete or inferior manner, if the contract is apportionable, and the labor done and material furnished is appropriated by the other party to the contract, he is liable to the contractor for what such labor and material are reasonably worth, to be determined by the contract price, less payments, damages sustained, and what it would cost to complete the contract. *Gonzales College* v. *Mc-Hugh*, 21 Tex. 256; *Gruetzner* v. *Aude Furn. Co.*, 28 Mo. App. 263; *Actna Iron & Steel Works* v. *Kossuth County*, 79 Iowa 40; *Gove* v. *Island City M. & M. Co.*, 19 Ore. 369. See, also,

*Dillon & Harrison* v. *Land Co.,* 80 S. E. 471, this day decided, and not yet reported.

Now as to the instructions. We think the court erred in its modification of plaintiffs' instructions Nos. 1 and 2. The first, as proposed, would have told the jury that if Alexander, general manager, authorized the drilling of these wells, and there was no express warranty by plaintiffs that they would yield any particular amount of water, they should find for them a reasonable amount for the drilling thereof; the second, as proposed, would have said to the jury, that although the contract of June 22, 1907, was found to contain a warranty, that the well mentioned should produce twenty gallons per minute, yet if they found from the evidence that Alexander, general manager, stopped plaintiffs from drilling that well deeper and caused them to drill the three additional wells, or acquiesced therein, they should find for the plaintiffs a reasonable and fair compensation for the drilling thereof. The modification imposed by the court on each of these instructions, was, "unless the jury shall further find that the drilling of the three wells was covered by a modification of the written contract of June 22, 1907, and that such modification did not mention or disturb the provision concerning the quantity of water to be produced." These modifications rendered the instructions misleading. It was proper to submit to the jury thereby the question whether the alleged contract for drilling the three wells was only a modification of the written contract, but not to condition recovery on whether or not the jury should find that the modified contract mentioned or disturbed the provision of the contract as to the quantity of the water to be produced, for, as we have held, that contract did not amount to a guarantee; and, if partial performance of the contract was accepted or the labor and material appropriated by defendant, plaintiffs were nevertheless entitled to recover all or part of the contract price, on the principles herein enunciated.

Plaintiffs' instruction number three we think should have been given. By it the jury would have been instructed that if they found from the evidence that the contract of June 22, 1907, had been mutually abandoned by the parties, plaintiffs were not bound by the terms and stipulations of that contract.

As already noted, there was evidence on this question entitling plaintiffs to an instruction on that theory of the case.

Instruction number four was rightfully refused. By it the court was asked to tell the jury that they were authorized to find a verdict for plaintiffs, for $234.00, with interest thereon from the date of the contract, regardless of the contract of June 22, 1907. Right to recover that amount depended on whether the jury should find an independent or modified contract for drilling the three wells, and whether there had been substantial or only partial performance of the contract, and whether, if only partial performance defendant was damaged, and the amount thereof.

By instruction number five, refused, plaintiffs asked the court to say to the jury, in substance, that if there was no written or verbal agreement to drill the three wells, the law would not imply an obligation on the part of plaintiffs to find water in any quantity or quality; that such guarantee would require an express stipulation to that effect. We think this instruction stated a correct legal proposition, but it assumes that there was no written or verbal agreement. Plaintiffs themselves prove a verbal agreement to drill the three wells. The instruction was therefore misleading and was rightfully rejected.

Plaintiffs complain of defendant's instruction No. 3, given. It told the jury that the contract of June 22, 1907, did not allow or promise payment of the $234.00, until water should be produced in the stipulated quantity, and that under its terms nothing would be due plaintiffs until a well of that capacity was produced; that the burden of showing any modification of that contract rested on the plaintiff, and that if such modification provided nothing different concerning the quantity of water to be produced, the original contract would govern, and that plaintiffs' compensation would not be due until water was produced in the quantity stipulated, unless, the instruction said, the jury should find the plaintiffs had been prevented from complying with the contract by acts of the defendant. This instruction we think was in contravention of some of the principles laid down in this opinion. It misinterprets the obligation of the contract respecting the finding of the required quantity of water. Plaintiffs' right of recovery does not depend, we think, upon the actual finding of the quantity of

water required, but upon plaintiffs going to such reasonable depths as might be required by defendant to find the desired quantity. And whether the original contract would govern as to quantity, nothing being mentioned in the new contract, would depend upon the finding of the jury, upon the evidence, whether the new contract was an original and independent contract, or a modification only of the old.

For the foregoing reasons we are of opinion there was error in the judgment. We have not overlooked the fact that defendant gave no notice of recoupment of its damages, nor that there was no attempt upon its part to show the amount of its damages, if any, sustained by supposed breach of the contract by plaintiffs. When the case goes back it should be tried on correct legal principles, and on proper instructions to the jury.

The judgment is reversed, and plaintiffs are awarded a new trial, with their costs incurred in this court.

*Reversed, and new trial awarded.*