# CHARLESTON.

George E. McComas & Sons *v.* Sharlow Gas Coal Company.

Submitted February 27, 1923.    Decided March 6, 1923.

1. Principal and Agent—*One Dealing With Agent is Bound to Know His Power to Act and Extent of Agency.*

    Generally, where one deals with an agent he is bound to know the power and authority of the agent to act, and the extent of the agency; he deals at his peril. (p. 269).

2. Mines and Minerals—*Superintendent of Employees in Mining and Loading Coal Has no Implied Power to Purchase Expensive Mining Machinery; Power of Superintendent of Employees in Mining and Loading Coal to Purchase Expensive Mining Machinery Cannot be Inferred From Fact That he Manages Ordinary Business of Company.*

    A superintendent of a coal mining corporation in charge of the employees and the mining and loading of coal has no implied power to purchase expensive machinery for use at the mine. Such power cannot be inferred from the fact that he manages the ordinary business of the company in producing and loading coal. (p. 270).

3. Same—*Mining Corporation Held not Bound by Purchase by Superintendent of Mining Machinery.*

    Where a coal mine superintendent agrees to purchase expensive machinery upon condition that it will perform the work for which it is purchased, and the machinery is taken into his possession and on trial demonstrates its capacity to perform the work; but as soon as its presence and purpose on the company's property is ascertained by the mining corporation, it immediately repudiates the alleged purchase, and directs the machinery to be removed from its property, and

proffers to pay for whatever benefits the corporation received from the use of the machinery while on trial, and the machinery is no longer used by it after that time, the corporation has not ratified the purchase, and will not be bound thereby; it clearly appearing that such alleged purchase was not authorized by the corporation and was not within the ordinary duties of the mine superintendent. (p. 271).

(McGinnis, Judge, absent.)

Error to Circuit Court, Boone County.

Action by Geo. E. McComas &. Sons against the Sharlow Gas Coal Company. From a judgment for defendant, plaintiff brings error.

*Affirmed.*

*L. Fulton* and *B. J. Pettigrew,* for plaintiff in error.
*E. P. Murphy* and *Leftwich & Shaffer,* for defendant in error.

Lively, Judge:

This is an action of assumpsit for $4,000, the price of a steam shovel alleged to have been sold by plaintiff to defendant. The declaration contains the common counts. Upon an issue of non-assumpsit a trial was had before a jury, and at the conclusion of the evidence the court directed a verdict for defendant, which was accordingly returned, and a judgment of *nil capiat* rendered. From this judgment plaintiff prosecutes this writ of error.

The court came to the conclusion as a matter of law that O'Neal, the mine superintendent, had no power, express or implied, to purchase from plaintiff the steam shovel. This is the controlling question, and is the only point of error upon which the plaintiff insists, and upon the decision of this point the case depends.

Plaintiff was engaged in constructing roads, and had been using the steam shovel in the vicinity of defendant's coal mine. Defendant was operating a drift mine on a lease of small acreage, and when railroad cars were not on its side track to receive the coal from the tipple, in order to keep its mine in operation, it piled not more than one day's run of coal on the ground near the switch, and when cars arrived

the coal was hoisted from the ground. Some time prior to the alleged purchase of the shovel defendant had used a hoisting machine with a clam shovel engine which it had sold. Plaintiff testified that in October, 1920, about the time he finished work on the road, O'Neal, defendant's mine superintendent, approached him with a proposition to rent the shovel for use above indicated, but that he, plaintiff, refused to do so, but proffered to sell the same for $4,500. He says O'Neal finally agreed to purchase the shovel if it would load at least four cars per day. The beam was considered to be too short for the purpose of hoisting the coal, and it was agreed that it should be lengthened about eight feet, which was done by the plaintiff, the expense of which was afterwards paid by O'Neal, but the amount is not disclosed. The shovel was moved to the mine, and it is in evidence that on one or two occasions it loaded four cars a day, and possibly on one occasion five cars. It appears, however, that the shovel was not extensively used. After it had been demonstrated that the shovel would load four cars per day, which plaintiff claims was the only condition precedent to sale, O'Neal was asked for settlement of the purchase price, and according to plaintiff's testimony O'Neal said it would be paid when he took the matter up with some member of the company, whose name he could not remember, who lived at St. Albans. Some time in December, 1920, a month or so after the negotiations for the sale, he was notified by O'Neal that the company would not take the shovel, and to come and remove it. After some efforts for adjusting the controversy this suit was instituted at May Rules, 1921. O'Neal denied that there had ever been any purchase. The substance of his evidence is that the shovel was placed at the mine for trial, and if after trial the company found it efficient and suitable for the purpose, the proposition of sale would be taken up with them. He denied that there was a purchase, and denied that he had any authority to purchase. There is evidence in the record to the effect that plaintiff was negotiating with other persons for the sale of the shovel while it was at the com-

pany's mine. It is a significant fact which tends to bear
out the contention of O'Neal, in that no terms of purchase
were agreed upon. Plaintiff says that $4,000 was to be
paid, the down payment was not agreed upon but that he,
plaintiff had it in mind to ask for $2,000 cash and the bal-
ance in two and four months. Usually where there is a
sale the terms are agreed upon at the time. However, for
the purpose of considering the action of the court in giv-
ing a peremptory instruction for defendant, we must dis-
card all of defendant's evidence in conflict with that of
plaintiff. *Cobb* v. *Glenn Boom & Lumber Co.,* 57 W. Va. 49,
49 S. E. 1005; *Estep* v. *Price,* decided this term. Following
this rule, and disregarding O'Neal's evidence in conflict with
that of plaintiff as to the sale, we must conclude that a sale
was made. Did O'Neal have authority to purchase this
expensive machinery? It is contended by plaintiff that the
fact that O'Neal was on the ground as mine superintendent,
controlling the employees with power to hire and discharge
them and in active charge of producing and loading coal,
his authority to make the purchase was implied; that the
purchase would fall within the scope of his ordinary duties,
and that the company, by placing O'Neal as superintendent
and in active charge, held out to the public that he had such
authority. It is not shown that O'Neal ever purchased any
machinery of any character, or ever purchased any supplies
whatever for the use of the mine. This was the only trans-
action he ever had with plaintiff. It is shown that O'Neal
had no authority to make purchases, and if any supplies of
any character were needed at the mine he first made appli-
cation or requisition therefor, which went before the board
of directors or the secretary of the company for consideration
by the board, and that they, the directors, always provided
funds for the purchase, beforehand. O'Neal had a little
stock in the company, but was not one of its officers. At
the time there were four directors, three of whom resided
in Huntington, and the fourth, J. O. Bledsoe, who was also
president, resided at St. Albans, a short distance away from
the mine. Bledsoe was also the general manager of the

company, and while he was not on the ground, he visited the mine at infrequent intervals, was in close touch with it and controlled its affairs. O'Neal had no authority except for producing the coal. Bledsoe, himself, had no authority to make purchases for machinery or other supplies at the mine. It is in evidence and not contradicted that at the time of the negotiations for the purchase of the shovel and its use at the mine, Bledsoe was afflicted with rheumatism and was in some sanitarium in the west. Upon his return to St. Albans, on the 10th of December, 1920, the matter of the steam shovel was brought to his attention, and he promptly informed O'Neal that his company would not purchase a steam shovel, and directed him not to use it, and to get it off of the property. He says O'Neal had no authority whatever to make purchases of any kind, and that the first time he ever heard of the shovel being at the mine was on the 10th of December when he understood that it was there under a proposal of sale and was put there on trial, and when he told O'Neal that they did not have use for that character of machinery. He says he never knew who brought the shovel there or to whom it belonged until he was served with process to attend the trial. He says further that the only authority O'Neal had was to "run coal," and not to make purchases for the company. Plaintiff was called in rebuttal, and stated that at the time the sale was made O'Neal told him that he had authority to make the purchase.

It is well settled as a general proposition of law, and by our decisions, that generally where one deals with an agent he deals at his peril and is bound to know the power and authority of the agent and the extent of his agency. If the agent's authority is in writing the person dealing with him is supposed to have read it. It is his duty to inquire into the extent of the agency and of the agent's power to contract. *Uniontown Grocery Co.* v. *Dawson,* 68 W. Va. 332. This proposition of law is so well settled that it is useless to cite authorities therefor. A superintendent of a coal mine in charge of the employees and the mining and loading of the products of the mine has no implied power simply from

that fact to purchase expensive machinery for use at the mine. Indeed, the general manager of the company, whose powers are much more extensive than those of the superintendent at the mine, has no such implied power. *Varney & Evans* v. *Hutchinson Lbr. & Mfg. Co.*, 70 W. Va. 169. It is contended, however, that as the company had placed O'Neal in charge of its affairs on the ground and that Bledsoe, the general manager, did not visit the mine except at infrequent intervals and was engaged in other duties, O'Neal, being left in charge of the affairs of the company, plaintiff could presume that the purchase of this machinery fell within the scope of his authority. It may be conceded that if the contract was a part of the ordinary business of mining coal, that it fell within the scope of O'Neal's duties; or that if he had been making like purchases prior thereto, with knowledge and consent of the corporation, then the act would fall within his apparent authority, and the plaintiff would have the right to deal with him and with the corporation upon that theory. The principle is tersely stated by Cook on Corporations, sec. 716, in which he says: "And in all cases the president binds the corporation by his acts and contracts when he is expressly authorized so to act and contract or when he has been permitted by the corporation for some time to act and contract for it." The plaintiff, to sustain his contention that O'Neal had implied, if not express, authority to purchase the machinery, cites *Union Bank & Trust Co.* v. *Long Pole Lbr. Co.*, 70 W. Va. 558; *Thomas and Moran* v. *Traction Co.*, 73 W. Va. 374; *Williams* v. *Ins. Agency*, 79 W. Va. 16; *Producers Coal Co.* v. *Mifflin Coal Min. Co.*, 82 W. Va. 311; and *Hartley* v. *Woodenware Co.*, 82 W. Va. 780. It will be seen by an inspection of the *Union Bank & Trust Co.* v. *Long Pole Lumber Co.* case that the corporation was held liable on notes which had been given to the bank by the corporation, signed by the president, and after the president had ceased to be such the notes were renewed by him, the bank not knowing at the time that he was no longer president. The corporation had received the money and its benefits. In *Thomas & Moran* v. *Traction Co.* the manager had been given authority to make a contract for the drilling

of a water well, and afterwards changed the contract in some important features without authority from the board of directors. The court there held that his powers were coextensive with the business intrusted to him, and he had apparent authority to bind the corporation by contracts incident to the business which was delegated to him to transact. In *Williams* v. *Ins. Agency* there was neither implied nor apparent authority in the agent, but his agency was afterwards ratified by an acceptance and use of the money which had been obtained by the agent's act. In the case of *Producers Coal Co.* v. *Mifflin Coal Min. Co.* the general manager of the coal company had executed a contract for the sale of coal, and it was held that the company was bound because he had implied authority to do so by virtue of his position as representing it in the general management of its business, an ordinary feature of which was the sale of the products of its coal mine. The general manager was a director of the company as well as its general manager, and had been one of the controlling directors in the company from its organization. He had been selling coal, and it was held that such acts fell within his ordinary duties. In the case of *Hartley* v. *Woodenware Co.*, it appeared that the board of directors of the corporation had acquiesced in the powers and authority exercised by Smith and Race, the agents, for a long time, though their authority had not been expressly conferred. The corporation had actual or constructive notice of the exercise by them of the agency and tacitly acquiesced therein. The agency was implied. That case is quite different from the one under consideration.

A mine superintendent as such has no authority or power to purchase, without the sanction of his company, valuable mining or loading machinery. We do not think the facts and circumstances here shown are sufficient to give him that implied authority; or that by the acts of the company it has held him out to the public as having such authority. No previous act of like character has been shown on his part; on the contrary, it appears that he has never so acted, and that he never had any authority to do so. It is urged that

because he employed counsel to defend this action his implied authority to purchase can be reasoned therefrom. The employment of counsel was directed by the president of the company; and even if he had done so that fact, taken with the other circumstances, would not be sufficient. While it is not insisted upon that the company has confirmed the act of its agent by allowing the shovel to be used in its business, it is clear that there has been no confirmation from this fact, because the company offered to pay for the use of the machine while it was being tested, as soon as knowledge of its use was acquired; and as soon as the presence of the shovel on the company's property was ascertained by the president he directed that it be taken away. Plaintiff refused to accept any sum for rental. There has been no acceptance of benefits.

We think this case falls within the influence of *Varney & Evans* v. *Hutchinson Lbr. & Mfg. Co., supra.* In that case the president of the lumber company had purchased a sawmill for the use of the company, and suit was instituted for the purchase money, and plaintiff contended that the purchase was made; and the president of the company contended that no purchase had been made; and that he did not have the authority to purchase such expensive machinery. The court refused to allow him to testify as to his authority, and this court held the refusal to be error. It was also held that the evidence relied upon to prove the authority was wholly insufficient, there being no evidence of any established course of business or conduct on the part of the president relating to transactions of that character and acquiescence of the company therein, nor was there evidence of ratification of the alleged contract, or receipt of benefits thereof in any sense or degree. This is practically the same situation here, except that this purchase is alleged to have been made by a superintendent at the mine, who, of course, does not have the large powers which are supposed to repose in a president of a corporation.

We think the evidence is not sufficient to sustain the agency and that the plaintiff has failed in his proof of author-

ity of the mine superintendent to make this purchase. We, therefore, think the court as a matter of law properly instructed the jury to find for defendant, and the judgment will be affirmed.

*Affirmed.*