S. D. HOLMES ET AL. v. CHARTIERS OIL CO.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS
OF WASHINGTON COUNTY.

Argued October 20, 1890—Decided January 5, 1891.
[To be reported.]

(a) A verbal contract was made for the drilling of an oil well at the price of $1.75 per foot, the depth not being specified. After developing oil, the contractor drilled further, until nearly through the oil sand, when the tools were lost in the well and could not be recovered. The owner took possession, tubed the well, and pumped oil for over eighteen months :

1. If the well, when possession of it was taken by the owner, had been drilled to such a depth as answered the intended purpose, the contractor was entitled to recover the contract price, less such damages as would compensate the owner for any loss occasioned by the failure to remove the tools from the well: Gillespie Tool Co. v. Wilson, 123 Pa. 19, distinguished.

Statement of Facts.

2. When the controversy, in an action upon such contract, is as to whether there has been such substantial compliance by the contractor with the terms of his contract as would entitle him to recover thereon, evidence as to the average cost of drilling a well, at the time the one in question was drilled, is irrelevant.

3. An offer to prove, by the superintendent of an oil company, the depth of a well drilled for the company, when the witness has no personal knowledge of the fact, all his knowledge being derived from reports made to him by a subordinate who made the measurements, is inadmissible.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 1 October Term 1890, Sup. Ct.; court below, No. 181 May Term 1887, C. P.

On March 28, 1887, S. D. Holmes and others having obtained judgment against McCauley Brothers for the sum of $1,965.50, caused an execution-attachment to be issued and served upon the Chartiers Oil Company, as garnishee of the defendant firm. The garnishee answered, denying the possession or control by it of any moneys or assets due or belonging to the defendants. In obedience to a rule to plead, the garnishee, on March 28, 1889, put in the pleas, nulla bona and set-off.

At the trial on September 7, 1889, it was shown that, in 1886, the Chartiers Oil Company was carrying on operations as the lessee for oil purposes of the Cameron farm, situated in what is known as the Smith pool in Washington county. A number of wells were drilled upon the farm prior to September, 1886, some of which were large producers. About September 25, 1886, the company made a verbal contract with McCauley Brothers, a firm of oil-well contractors, for the drilling of a well on said farm designated as Cameron No. 3, for the consideration of $1.75 per foot, the depth to which the well should be drilled not being specified in the contract. S. F. McCauley, the member of the contracting firm with whom the agreement was made, testified that his understanding of the contract was that the well was to be drilled to completion; that is, through all the producing sands in the district wherein it was located. A number of witnesses testified for the garnishee that by the usage of the oil trade, the words, " to drill a

well," in such a contract, meant, in the absence of any provision as to the depth of the well, to drill through all known producing sands of the particular district, and to deliver the well to the owner clear of all obstructions. Testimony for the plaintiffs tended to disprove the existence of any general and uniform usage to that effect.

The known producing sands in the Smith pool were called the Gantz and the Fifty-foot. These two sands were very close together, with a "break," or vein of slate between them, a few feet in thickness, the Fifty-foot being below the Gantz. The average combined thickness of the two sands and the intervening break, was between 90 and 100 feet.

In pursuance of their contract, McCauley Brothers proceeded to drill well No. 3. In accordance with the usage of the trade and the understanding of the parties to the contract, the contractors were to receive and did receive from the company, on account of the contract price, $500 when the first casing was inserted, and $500 upon the insertion of the salt-water casing, these sums being paid, however, without regard to the depth of the well at those stages of the work. When the well had been drilled into the Gantz sand, a "pay-streak" was developed. The depth of this pay-streak was in dispute; the testimony for the plaintiffs placing it at twelve to fifteen feet below the top of the Gantz sand, and the testimony for the garnishee tending to show that it was twenty-three feet below the top of the sand. Drilling was continued through the Gantz sand and into the Fifty-foot, until, at the depth of seventy-eight feet below the top of the former, according to the plaintiffs' testimony, or seventy-one feet, according to the testimony for the garnishee, the drilling tools were dropped in the well. By means of a few days' "fishing," the tools were recovered and drilling resumed, but, after four days' more work, which added probably from two to eight feet to the depth of the well, they were again lost and the effort to recover them, though continued for some time, proved unavailing.

The oil company then took possession of the well, tubed it and pumped it for over a year and a half, when it was abandoned, after having produced about 2,200 barrels of oil. Witnesses for the garnishee testified that the tubing was done by the company at the request of McCauley Brothers, in order to

pump out the accumulated oil and thus facilitate the contract-
ors' efforts to recover their tools, but that, after this had been
done, the contractors never returned to the well and made no
further attempts to get the tools out. The total depth to which
the contractors had drilled, was fixed by the plaintiffs' wit-
nesses at 2,429 feet, and by the witnesses for the garnishee at
2,414 feet.

If the depth of the well and the location of the pay-streak
were as the oil company claimed them to be, the lost string of
tools, resting on the bottom of the well, would extend above
the pay-streak. Witnesses for the company testified that the
pay-streak, above mentioned, was the only one developed in
this well, although the workmen employed at it were under the
impression, at one time, that a second pay-streak had been
found, which was afterwards discovered to be a mistake; that
in these circumstances, the effect of the presence of the tools
would be practically to ruin the well, as it would be impossible
to clean it out or torpedo it, and the tools would permit an ac-
cumulation of sediment which would clog the well and grad-
ually destroy its production entirely.

Witnesses for the plaintiffs, who had worked at the well,
testified that the tools were left in such a position as not to
interfere with the production of oil from the developed pay-
streak, and that the well, when abandoned by the company,
had been pumped dry and had produced all the oil it was cap-
able of producing had the tools not been in it. There was also
testimony that no pay-streak had ever been discovered in the
numerous wells drilled in that locality, below the depth to
which this well was alleged by the plaintiffs' witnesses to have
been drilled. Witnesses for the garnishee testified that a pay-
streak was sometimes found in the bottom of the Fifty-foot
sand, and this was admitted upon cross-examination by S. F.
McCauley, when upon the stand as a witness for the plaintiffs.

In connection with the subject of the depth of the well and
pay-streak, a witness for the garnishee, Fred Covey, testified
that he was in the employ of the oil company, as foreman in
charge of the Cameron farm; that from time to time, during
the drilling of well No. 3, as measurements of depth were made,
the witness made a record thereof in a memorandum book,
which at the time of the trial was at his home; and that from

Statement of Facts.

day to day, as the witness would see the company's superintendent, he gave to the latter reports of the results of all such measurements. Samuel Watson, the superintendent, was then called, and testified that a book which he produced contained a record of the Cameron No. 3, kept by the witness from day to day, as the data were given to him by Covey, who would read them to the witness from his book, and the witness would then enter them in the book kept by himself:

Q. Did I ask you at what depth you got the sand in that well?

Plaintiffs' counsel: Did you make the measurements yourself? No, sir, I have Mr. Covey to make all my measurements.

Defendant offers to prove by this witness the depth at which they reached the sand in this well No. 3 on the Cameron farm; also the depth at which they got the first pay-streak; the depth of the well immediately before the tools were lost; to be followed by evidence showing the size of the tools, the length of them and of the other materials left in that hole; to show that the obstruction extended above both the pay-streaks in the sand.

Cross-examination : Your knowledge in regard to the facts inquired of by Mr. Birch, is derived from your superintendent? A. Derived from Mr. Covey, yes, sir. You have no original knowledge yourself, except through him? A. Yes, sir. And he is the witness who has been on the stand and testified? A. Yes, sir.

The offer is objected to as incompetent and irrelevant.

By the court: The offer, we think, is competent; but the witness having said that he has no personal knowledge of the matters inquired of, his testimony would not be competent, because it is hearsay.

The offer is renewed, with the further explanation that the witness preceding has testified that he was the servant of the witness on the stand, and in the course of his business as such employee he made these measurements and reported such measurements at the time to the witness, who made a record of them, and proposes to use such record for the purpose of refreshing his memory; for the purpose of showing the depth of the well to the top of the sand, and to show the depth at which they found the first pay-streak; to show the depth at

which they found the second pay-streak, and to show the depth
immediately before the tools were lost; to be followed by evi-
dence showing the length of the tools, and to show that the
tools extended above any pay-streak discovered in that well.

Objected to ; first, the witness having testified he had no per-
sonal knowledge as to the facts as to which he is being inquired
of, his evidence is secondary and hearsay ; second, because the
original evidence is shown by a witness produced on the part
of the defendant to be in his possession, and is not produced,
and it is not competent for this witness to refresh his recollec-
tion from secondary evidence furnished to him by the superin-
tendent.

By the court : Objection sustained ; exception.[3]

The garnishee also made the following offers of testimony :

D. S. Kemp, on the stand :

Q. What is the cost, the average cost in 1886–87, of drilling
a well, outside the labor and materials furnished by the con-
tractor ? For the purpose of showing the amount of money
expended by the defendant here in the well, Cameron No. 3,
outside the money they paid these contractors ; this is to rebut
any presumption that they have received any appreciable ben-
efit from the well in the condition in which it was left.

Objected to, as incompetent and irrelevant :

By the court : Objection sustained ; exception.[1]

I wish to know, from your experience and knowledge of the
business, where is the expense of drilling a well? For the
purpose of showing that this contract price, being at $1.75
per foot, would be far in excess of the actual cost of such
drilling in a part of the well, while, in the lower sands and
for the completion of the well, it would be less than the cost;
and that the price fixed for drilling a well, by the foot, is to
meet the expense from the top to the bottom.

Objected to, as incompetent and irrelevant.

By the court : Objection sustained ; exception.[2]

At the close of the testimony the court, McIlvaine, P. J.,
charged the jury in part as follows :

The defendant company claims that to drill an oil well to
completion in the Smith pool, is to drill it through the Gantz
and Fifty-foot sands and into the rock or slate below a suffi-

cient depth to make what is called a pocket, if it were necessary. The plaintiffs claim that a completed well is not necessarily drilled through the Fifty-foot sand, but that, after the pay-streak in the sand is passed a sufficient depth to make a pocket below the pay-streak, it is not unusual for the drilling to stop, and that it is not necessary to drill any further to make what is termed a completed well. On this branch of the case the defendant company has called a number of witnesses who are practical oil men, for the purpose of showing the usage and custom among oil operators in regard to the depth an oil well in this pool is to be drilled, where nothing is said by the contracting parties as to how deep it is to be; and it is claimed by the company that the testimony of these witnesses shows that this usage or custom requires a well to be drilled through the Gantz and Fifty-foot sands in order to be considered a completed well.

The parties to this contract having failed to specify how deep the well should be drilled, or what should be considered a completed well, this testimony was competent; for every person conducting a trade is supposed to use the language of the trade, and in making a contract with the trade to use the terms in the sense in which they are used in that trade, unless the usage is precluded by the terms used in the contract. The plaintiffs claim that no such usage exists, as is sought to be established by the defendant company; and it will be for you to say, from the evidence, whether this usage did exist, at the time this contract was made, or not, and whether the contracting parties had knowledge thereof.

A usage, before it can be interpolated into and made a part of a contract, must be shown to be general, uniform and notorious, and must be directly known to the parties to such a contract, or be so general and universal in its character that knowlege may be presumed on their part. Having settled this first dispute, that is, having determined from the evidence what kind of a well the McCauleys were bound to drill under their contract, then the next question arises, and that is this: did they perform their part of the contract; did they do that which you may find they were bound to do under their contract? . . . . .

It will be your duty to take all the testimony bearing on this

Charge of Court below.

branch of the case and ascertain from it whether the Mc-Cauleys substantially performed their contract, or totally failed to do so. A substantial performance is all the law requires. It is not an absolute and literal performance in every detail. If one party to a contract substantially performs his part, acting honestly with a bona fide intention to faithfully perform the contract, although there is a variance in some comparatively slight particular, he would be entitled to recover. But, in such a case, if the other party is injured by such variance, he is entitled to a deduction therefor from the contract price, unless the work as done is accepted for full performance of the contract. But, on the other hand, if the performance by one party who contracts to do work, is in every way radically defective, in view of the purpose for which the work is being done, and in every way inferior to the performance contracted for, the other party is not bound to pay for such work although it may be of some value to him.

What then, was the character of the work done by McCauleys? First, did they leave this well in such condition that it was radically defective in view of the object for which it was drilled and, as an oil well, practically ruined? If so, then your verdict should be for the defendant company. Second, did they fully comply with their part of the contract, and give to the company such a well as fully met the requirements of that contract? If so, your verdict should be for the plaintiffs for the full amount of the balance due McCauleys under the terms of the contract. Third, did they substantially comply with the requirements of their contract, so that the defendant company can be fully compensated in damages for the variance from a literal and complete compliance therewith? If so, then your verdict should be for the plaintiffs for the balance due Mc-Cauleys under the terms of the contract, less the amount of damages you shall find the defendant company has suffered by reason of McCauleys not fully and completely complying with the terms of the contract. But, in case you find these damages, suffered by the company by reason of the failure of the McCauleys to substantially perform their contract, are greater in amount than the balance due them by the terms of the contract, then of course your verdict should be for the defendant. . . . .

The plaintiffs ask us to charge you as follows:

4. If the jury find from the evidence that McCauley Brothers, drilled an oil well for the defendant company to such a depth as answered the intended purpose, and that the well was taken possession of by the defendant and was used for the production of oil, then the plaintiffs are entitled to recover the contract price for the drilling of the said well, less such deduction for damages as will compensate the defendant company for any loss sustained by it on account of the failure of McCauley Brothers to remove the tools from the bottom of the said well.

Answer: Affirmed.[4]

5. If the jury find from the evidence that the well drilled by the McCauley Brothers was completed through all the pay-streaks in the oil producing sand and was turned over by said McCauley Brothers to the defendant company, in a condition fit for the production of oil, though less fit than it would have been had the tools not been lost in it, yet the plaintiffs are entitled to recover their demand, less such sum as will compensate the defendant company for any loss sustained by reason of the failure of the McCauley Brothers to withdraw the tools.

Answer: Affirmed.[5]

6. If the jury find from the evidence that the well was drilled through all the producing pay-streaks in the Smith pool; that the only pay-streak in said well was found at a depth of about fifteen feet from the top of the Gantz sand; that the well was drilled about seventy-one feet below this pay-streak; that the failure to take out the tools from the bottom of the well would not interfere with the well producing all the oil that it was capable of producing, then the plaintiffs have substantially complied with the contract and are entitled to recover.

Answer: Affirmed.[6]

The defendant asks us to charge as follows

4. If the jury find that the contract in this case is entire, the plaintiffs are bound to show complete performance therewith; without doing which they cannot recover.

Answer: Refused; a substantial performance, such as that the variance from complete performance can be compensated in damages to the defendant company, will sustain this action.[7]

5. If the jury find that the McCauley Brothers, defendants,

Arguments.

agreed for a certain price to drill an oil well for the garnishee and failed to perform that contract, and that all has been paid them under the contract that they were to receive until performance, plaintiffs cannot recover therefor upon a contract or on a quantum meruit, although the work done be beneficial to the defendant garnishee.

Answer: We answer this point this way: If the jury find that McCauley Brothers agreed for a certain price to drill the oil well in question, and failed to perform that contract, or performed it in a radically defective way, in view of the purpose for which the work was to be done, and that all has been paid them under the contract that they were to receive until full performance, then the plaintiffs cannot recover in this action, although the work done be beneficial to the defendant company.[8]

The jury returned a verdict in favor of the plaintiffs, finding that there was in the hands of the garnishee the sum of $2,774.82 belonging to McCauley Brothers. A rule for a new trial having been discharged, judgment was entered in favor of the plaintiffs and against the garnishee, for $1,965.50, with interest from March 25, 1887, and costs, the sum due being liquidated at $2,264.25. Thereupon the garnishee took this appeal, assigning for error:

　1–3. The refusal of the garnishee's offers.[1 to 3]
　4–6. The answers to plaintiffs' points.[4 to 6]
　7, 8. The answers to garnishee's points.[7 8]

*Mr. T. F. Birch*, for the appellant:

1. The first, second and third assignments of error should be sustained, in view of the general charge of the court below and its answers to points which are assigned for error. If, as the charge indicated, the plaintiffs were entitled to recover whether the contract was entire or severable, then the oil company had a legal right to offer the testimony objected to, under its plea of set-off, or even under the general issue. The offer covered by the first assignment was admissible to meet the claim of the plaintiffs that the company had received certain fruits of labor performed on the well, over and above the sums advanced to the contractors, without compensation.

Arguments.

And if, as the answer to our fifth point intimated, the plaintiffs were entitled to recover on a quantum meruit, it was unfair to refuse to permit us to show, as proposed by the offer referred to in the second assignment, that the compensation claimed had not been earned. And the record mentioned in the third specification was not secondary evidence, but a book of original entries: Schollenberger v. Seldonridge, 49 Pa. 83.

2. In the answers to points the court made no distinction between an entire and a severable contract, or rather between an entire contract which may be met by substantial performance, and one that, by its nature and the intention of the contracting parties, requires a strict performance. Such intention must be ascertained from the language employed and the subject matter of the contract: 2 Parsons on Cont., *518, *519; Shinn v. Bodine, 60 Pa. 185. The mode of measuring the consideration or price, as by the bushel, ton or pound, will not change the effect of the agreement and prevent the contract from being an entire one: Shinn v. Bodine, supra; Shaw v. Turnpike Co., 2 P. & W. 461. There can be no dispute that the contract here in question was an entire one. It was to drill a well, for an entire consideration, to be computed at $1.75 per foot, and the fact that certain advancements were to be and were made during the progress of the work, does not sever the consideration. Moreover, the subject matter, the drilling of Cameron No. 3, was entire.

3. Terms used in a contract connected with a particular trade and made by a person conducting such trade, are to be understood in the sense in which they are accepted in that trade, unless that sense is precluded by the language of the contract: 2 Whart. Ev., § 962; Meighen v. Bank, 25 Pa. 288; Carter v. Coal Co., 77 Pa. 286. We showed by the testimony of sixteen experienced and disinterested contractors and operators that the term "to drill an oil well" meant, in the Smith pool, by the usages of the trade, to drill through all the producing sands in the district, and to deliver the well to the owner with a hole clear of obstructions. Moreover, S. F. McCauley admits that his contract was to drill through the producing sands. The contract, then, was an entire one, of such a kind that a substantial performance would not entitle the contractors to a proportionate part of the agreed compensa-

tion: Hall v. Rupley, 10 Pa. 232; Harris v. Ligget, 1 W. &
S. 305; Shaw v. Turnpike Co., 2 P. & W. 461; Roberts v.
Beatty, 2 P. & W. 63; McClurg v. Price, 59 Pa. 420; Quig-
ley v. DeHaas, 82 Pa. 267; Martin v. Schoenberger, 8 W. &
S. 368. This case is ruled by Gillespie Tool Co. v. Wilson,
123 Pa. 19.

*Mr. J. M. Braden* (with him *Mr. John W. Donnan* and *Mr.
Alvan Donnan*), for the appellees:

1. The contract was by parol. What it was, and what it re-
quired the contractors to do, were therefore to be determined
by the jury, and not by the court: McFarland v. Newman, 9
W. 59; Sidwell v. Evans, 1 P. & W. 386. This branch of
the case was submitted to the jury in a manner satisfactory to
the garnishee, as no exceptions have been taken to that part
of the charge; and the jury have found that the contract did
not require drilling through the fifty-foot sand, with a pocket
below it, but simply the drilling of an oil well.

2. It is not and was not claimed by us, that the contract was
apportionable, or that a recovery could be had for a part per-
formance upon a quantum meruit. Our claim was that it has
been substantially performed by the drilling of an oil well
which the company accepted and operated as such. There is
no such distinction as that propounded by appellant's counsel,
between entire contracts which may, and other entire contracts
which may not be satisfied by substantial performance. The
rule upon this subject was properly laid down by the court:
Pepper v. Philadelphia, 114 Pa. 111; Preston v. Finney, 2 W.
& S. 55; Danville Br. Co. v. Pomroy, 15 Pa. 159: Snodgrass
v. Gavit, 28 Pa. 221; Truesdale v. Watts, 12 Pa. 73. And,
the question of substantial performance was for the jury: Reel
v. Elder, 62 Pa. 316; Wenrich v. Heffner, 38 Pa. 207; Tay-
lor v. Preston, 79 Pa. 436.

3. The offers embraced in the first three assignments of error
were properly rejected. Whether the company received any
appreciable benefit or not from the well, was something the
contractors had nothing to do with, if they completed their
contract; nor, if the jury had found that the performance was
defective, would it have furnished any legitimate measure of
damages. The appellant is now seeking to make the offer

covered by the second assignment of error, relevant for a different purpose from that stated when the offer was made in the court below. And the testimony referred to in the third specification was clearly secondary and incompetent.

OPINION, MR. CHIEF JUSTICE PAXSON:

This record presents two questions, viz., (*a*) what was the contract between McCauley Brothers and the Chartiers Oil Company? and (*b*) was the contract substantially performed by McCauley Brothers? The first of these questions the court below submitted to the jury, for the reason that the contract was oral. The law is well settled that where a contract is in writing, its construction is for the court; where it is oral, it is for the jury: McFarland v. Newman, 9 W. 59; Sidwell v. Evans, 1 P. & W. 386. The second question was necessarily for the jury. They have determined both in favor of the plaintiffs, and, unless there be error in the manner of their submission, the judgment must stand.

The first three assignments of error are to the rejection of certain testimony offered on the part of the defendant. As to the offers embraced in the first and second assignments, we are unable to see their relevancy. The contract, as claimed by McCauley Brothers and as found by the jury, was to sink an oil-well at the price of $1.75 per foot, without specifying the depth. The well was drilled to a depth of about 2,400 feet and until it had passed from seventy to eighty feet through what is known as the Gantz sand, when the tools were lost and could not be recovered. The garnishee company appear then to have taken possession of the well, tubed it, and pumped two thousand or more barrels of oil therefrom. The attaching creditors, representing the contractors, claimed that there had been a substantial compliance with the contract; the oil company claiming that the contract was entire, and that there was no such compliance therewith as would entitle McCauley Brothers to recover. Under this state of facts, we are unable to see the relevancy of the testimony referred to. The claim on behalf of McCauley Brothers was to recover the contract price of sinking the well, less such deduction for damages as would compensate the company for any loss sustained by it on account of the failure of McCauley Brothers to remove the tools from

Opinion of the Court.

the bottom of said well. It is obvious, therefore, that an inquiry into the average cost of drilling a well in 1886 could not have thrown any light upon the issue before the jury. Its only effect would have been to mislead them.

The evidence referred to in the third assignment was competent, and, had the company offered to prove it by a competent witness, the learned judge would have admitted it. He excluded it on the ground that the witness on the stand had no personal knowledge of the facts he was called to testify to. All his knowledge was derived from his superintendent who had made the measurements.

The remaining assignments allege error in the answers to the points submitted by the respective parties. Although presented in different forms, they all raise the single question, was there a substantial compliance with the contract? The plaintiffs' fourth point called upon the court to instruct the jury as follows.

"If the jury find from the evidence that McCauley Brothers drilled an oil well for the defendant company to such a depth as answered the intended purpose, and that the well was taken possession of by the defendant, and was used for the production of oil, then the plaintiffs are entitled to recover the contract price for the drilling of the said well, less such deduction for damages as will compensate the defendant company for any loss sustained by it on account of the failure of McCauley Brothers to remove the tools from the bottom of said well."

This point the learned judge below affirmed. The rule upon this subject may be found in Danville Br. Co. v. Pomroy, 15 Pa. 159 : " Where a thing is so far perfected as to answer the intended purpose, and it is taken possession of and turned to that purpose by the party for whom it was constructed, no mere imperfection or omission, which does not virtually affect its usefulness, can be interposed to prevent a recovery, subject to a deduction for damages consequent upon the imperfection complained of. Of course, the indulgence is not to be so stretched as to cover fraud, gross negligence, or obstinate and wilful refusal to fulfil the whole engagement, or even a voluntary and causeless abandonment of it." This rule was cited and approved in Pepper v. Philadelphia, 114 Pa. 96, and in other cases.

Opinion of the Court.

It was urged, however, that the recent case of Gillespie Tool Co. v. Wilson, 123 Pa. 19, is in conflict with this view. We do not so regard it. In that case there was a wilful departure from the terms of the contract in several respects, as will readily be seen by the following extract from the opinion of Mr. Justice STERRETT: "In several particulars the work contracted for was not done according to the plain terms of the contract. Nearly one half of the well was not reamed out, as required, to an eight-inch diameter, so as to admit five and five eighths inch casing in the clear. About 180 feet of the lower section of the well, also, was bored four or four and one quarter inches, instead of five and five eighths inches in diameter. In neither of these particulars, nor in any other respect, was there any serious difficulty in the way of completing the work in strict accordance with the terms of the agreement." The difference between that case and this is so obvious that extended comment is unnecessary. In the former there was a wilful departure from the terms of the contract, for, which no excuse or justification was offered. In this case there appears to have been no such departure. The jury have found that the well had been drilled to a proper depth, and the only omission was to fish up the tools from the bottom of the well, which, the evidence shows, the contractors were unable to do. The loss of the tools in this manner was a matter which might occur to any contractors. The well, as drilled, was a producing well, and the jury were properly instructed to deduct from the contract price any loss or damage which the company sustained by reason of the tools remaining therein.

Judgment affirmed.