**Richard J. GOLDINGER, Plaintiff,**
**v.**
**BORON OIL COMPANY, Defendant.**
**Civ. A. No. 72–765.**

United States District Court,
W. D. Pennsylvania.

May 6, 1974.

Paul H. Titus and John B. Leete, Pittsburgh, Pa., for plaintiff.

Michael Yukevich, Jr., of Thorp, Reed & Armstrong, Pittsburgh, Pa., for defendant.

## OPINION

WEBER, District Judge.

Plaintiff, whose contract with defendant to operate a retail gasoline service station was terminated effective January 24, 1972, has filed this complaint on causes of action which are all based on plaintiff's agreement with defendant to operate the retail gasoline station. Count I of the complaint alleges that such agreement was in violation of the antitrust laws of the United States, constituting a conspiracy to fix prices in violation of Sec. 1 of the Sherman Act, [15 U.S.C.A. § 1], or a tying arrangement in violation of Sec. 1 of the Sherman Act, or Sec. 3 of the Clayton Act [15 U.S.C.A. § 14]. Jurisdiction of Count I is claimed under the antitrust laws of the United States.

In Counts II and III of the complaint, plaintiff asserts diversity jurisdiction and pleads causes of action arising out of the same contract. In Count II plaintiff claims that his discharge was unjustified because the contract between him and the defendant was unconscionable and void. Count III of the Complaint complains that his discharge was void because it was arbitrary and unreasonable. Plaintiff claims treble damages under Sec. 4 of the Clayton Act, 15 U.S.C.A. § 15, for the cause of action asserted under Count I, and compensatory damages for the causes of action asserted in Counts II and III of the Complaint.

Both the plaintiff and defendant have moved for summary judgment on all counts of plaintiff's complaint.

The evidentiary materials presented by the parties consist of a Commission Manager Agreement of May 26, 1966 and a subsequent similar agreement of May 1, 1969, which was in effect at the time of termination. The relationship between the parties was conducted under these agreements. Also proffered were equipment schedules, operating reports, plaintiff's income tax reports, correspondence, deposition testimony of plaintiff and of defendant's division manager, and a consent decree entered into a United States District Court in Ohio with related exhibits. While objection has been made to the admissibility of certain evidence proffered, which objections were considered herein with respect to the matters upon which the court made its findings, we are primarily concerned with the search for a genuine issue of material fact.

It would appear from this status of the record that as to all causes of action pleaded the parties are in agreement that there is no genuine issue of any material fact and that the issues can be determined as a question of law. While the parties in their briefs and arguments assert many conflicting inferences and conclusions to be drawn from the undisputed facts it does not appear to the court after a review of the evidentiary material that there is a genuine issue of material fact between plaintiff and defendant.

PLAINTIFF'S COUNT I

## THE ANTITRUST CAUSE OF ACTION

A. *The tying arrangement allegation.* [Clayton Act, Sec. 3, Sherman Act, Sec. 1].

We find it appropriate first to consider plaintiff's allegation that the contract between him and the defendant constituted a tying agreement in violation of Sec. 3 of the Clayton Act. We do this because the price fixing allegation of Count I involves consideration of the same elements as are necessary for the determination of Counts II and III, plaintiff's status as an employee or an independent dealer. A tying arrangement has been defined as follows:

"For our purposes a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." Northern Pacific Co. v. United States, 356 U.S. 1, 5–6, 78 S. Ct. 514, 518, 2 L.Ed.2d 545 [1958].

We do not reach the question of lessening of commerce or restraint of trade unless and until the facts establish that a tying arrangement exists. Hunter Douglas Corp. v. Lando Products, Inc., 215 F.2d 372, 376 [9th Cir. 1954]; Allied Equipment Co. v. Weber Engineered Products, Inc., 237 F.2d 879, 883 [4th Cir. 1956]; Stokes Equipment Co. v. Otis Elevator Co., 340 F.Supp. 937, 940–941 [E.D.Pa.1972].

Paragraph 8 of plaintiff's complaint recites that "plaintiff was required by defendant not to deal in TBA products, (tires, batteries and accessories) greases, oils, lubricants and other goods, wares and merchandise other than those of defendant's choosing." Although it is not specifically averred in the complaint we assume from plaintiff's allegation of a contract with defendant with respect to a retail gasoline station that the tying product was gasoline and that the

tied products were the other ones mentioned in paragraph 8.

It is essential in all tying cases under Sec. 3 of the Clayton Act that there must be a seller and a buyer or a lessor and a lessee and a tying and tied product, service or commodity. ("We need not discuss the respondent's further contention that the contract also violated § 1 and § 2 of the Sherman Act, for if it does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of the former." Tampa Electric Co. v. Nashville Coal, 365 U.S. 320, 335, 81 S. Ct. 623, 632, 5 L.Ed.2d 580 [1961]). Section 3 of the Clayton Act provides:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." (15 U.S.C.A. § 14).

"Furthermore, there should be a clear statement of whether or not there were any tie-in sales. The oblique and incidental assumption regarding such 'alleged' sales in Finding 22, is not an acceptable substitute for a definite and forthright Finding of Fact." Hunter Douglas Corp. v. Lando Products, 215 F.2d 372, 376 [9th Cir. 1954],

and:

"There can be no violation of the (Sec. 3 Clayton) Act unless there is a contract, sale or lease." Allied Equipment Co. v. Weber Engineered Prod. Co., 237 F.2d 879, 883 [4th Cir. 1956].

With these strictures in mind we must examine the nature of the business arrangement between the plaintiff and defendant. There is no allegation in the complaint that plaintiff purchased or was required to purchase or lease any product or property from the defendant. There is nothing in the evidentiary material including plaintiff's own deposition to show that he ever purchased or was required to purchase any product from the defendant except that plaintiff did purchase soap and towels for his gasoline station restrooms (not for resale), which he was under no obligation to purchase from defendant. The contract and the evidence show that the gasoline and other accessory products which were sold at retail in the gasoline station in question were supplied by the defendant to the station and title to this property remained in the defendant until it was sold to the retail consumer. The price at which the gasoline and other products were sold was determined by the defendant and the plaintiff received a flat rate commission per gallon on the sales of gasoline regardless of the price at which it might be sold but received a percentage of sales price commission on other products. Furthermore, the contract and the evidence show that there was no lease for the premises were plaintiff performed his services. The plaintiff was entrusted with custody of the retail gasoline station and the equipment of the defendant installed thereon without any requirement of rental or without a condition of occupancy for a fixed term.

A close examination of plaintiff's complaint reveals that there is no allegation that the plaintiff bought anything from the defendant or that he was required to buy anything from the defendant. Paragraph 8 of the complaint alleges that plaintiff was required by defendant not to deal in products other than those of defendant's choosing and paragraph 9 of the complaint alleges that plaintiff was required to give trading stamps to retail customers and to participate in promotional and advertising programs. Neither paragraph expresses any allegation of a sale or lease of property between plaintiff and defendant. The plaintiff's own testimony on deposition recites that except for supplies of towels and soap, which the plaintiff purchased from defendant for use in the station and which he also purchased from suppliers other than defendant, plaintiff purchased no other goods, wares, merchandise, machinery, supplies, or other commodities from defendant in the years from 1966 to 1972.

Plaintiff relies on Simpson v. Union Oil Co. of Cal., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 [1964]. In that case the court considered the effects of an arrangement between a plaintiff dealer and the defendant oil company wherein goods were placed with the dealer on consignment and title never changed until the sale to the retail customer. The Court disregarded the contractual designation and looked at the substance of the transaction to determine its antitrust effect.

"[T]he interests of the Government also frequently override agreements that private parties make. Here we hae an antitrust policy expressed in Acts of Congress. Accordingly, a consignment, no matter how lawful it might be as a matter of private contract law, must give way before the federal antitrust policy." (p. 18).

However, we find on examination of *Simpson* that the court was dealing with a situation considerably different in its factual background from the present case. Simpson was recognized by the Court as an independent dealer. He leased the gasoline station from the defendant company for a fixed term. Under the agreement the defendant company consigned gasoline to Simpson, retaining title until the gasoline was sold to the retail customer. The defendant company set the selling price for the gasoline. The plaintiff's profit from commissions on sales was nevertheless geared to the

rise or fall of the retail prices. The violation of the antitrust laws alleged by the plaintiff was a price fixing agreement. The Court commented upon the consignment arrangement as follows:

> "Dealers, like Simpson, are independent businessmen; and they have all or most of the indicia of entrepreneurs, except for price fixing. The risk of loss of the gasoline is on them, apart from Acts of God. Their return is affected by the rise and fall in the market price, their commissions declining as retail prices drop. Practically the only power they have to be wholly independent businessmen, whose service depends upon their own initiative and enterprise, is taken from them by the proviso that they must sell their gasoline at prices fixed by Union Oil."
> (pp. 20, 21).

*Simpson* does not deal with tying agreements. While it will be necessary to examine *Simpson* further with respect to the present plaintiff's further allegation that the agreement between him and defendant constituted an illegal price-fixing arrangement, we cannot see how *Simpson* aids in our determination of whether the present agreement between plaintiff and defendant constitutes a tying arrangement. The plaintiff in *Simpson* had all of the aspects of an independent dealer and the court's recognition of plaintiff's independent status was a basic point of departure in its examination of the effect of the consignment arrangement.

■ From all of the evidentiary materials presented we can find no basis for a finding that the contract between plaintiff and defendant bore any of the attributes of an illegal tying arrangement under Sec. 3 of the Clayton Act or Sec. 1 of the Sherman Act. There is no evidence which would cause the court on looking behind the form and language of the agreement to conclude that despite the appearance of a contract of employment the agreement's actual effect was that of a tying agreement.

B. *The price-fixing allegation.* (Sherman Act, Sec. 1).

Section 1 of the Sherman Act, 15 U. S.C. § 1 provides:

> "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal. . . .".

■ Agreements for price maintenance of articles moving in interstate commerce are, without more, unreasonable restraints within the meaning of the Sherman Act because they eliminate competition and agreements which create potential power for such price maintenance exhibited by its actual exertion for that purpose are in themselves unlawful restraints within the meaning of the Sherman Act. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 [1940].

Before any inquiry as to whether the documents before us are per se violations of the Sherman Act, or whether they have the effect of restraint of trade, the first and possibly decisive inquiry to which we address ourselves is the existence of an agreement, express or implied, between the parties hereto in violation of the Sherman Act.

There is no dispute that the prices of the products sold at the plaintiff's place of business were set by the defendant and that this control included not only those products which the defendant supplied for sale at this location, but the mechanical and repair services which were rendered by the plaintiff to customers at this establishment.

In paragraph 7 of his complaint plaintiff avers that he was "at all times relevant to this case an independent businessman who was financially responsible for the results of the operation of the gasoline station mentioned above, had a sizable personal investment in such business, hired and fired his own employees, paid for his own insurance, did all of his own bookkeeping, ran his own service and repair business on the premises, and

had the full risk of loss for any thefts or shortages of gasoline or other products procured from defendant."

It is the defendant's contention that plaintiff was not an independent businessman, but rather was defendant's employee, and that there can be no agreement or conspiracy in restraint of trade between a corporation and its employees.

■ The nature of the relationship created between the parties by the Commission Manager Agreements and the practice or course of conduct between the parties under these agreements will be determinative of the relation between the parties and the application of the provision of Sec. 1 of the Sherman Act to that relationship. It is settled law that a corporation and its employees are not separate legal entities for the purpose of forming a conspiracy under the Sherman Act:

"It is well established that a corporation cannot conspire with its officers, employees, and agents in restraint of trade within the meaning of the Sherman Act." Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203 [5th Cir. 1969].

"It takes two persons or entities to constitute a conspiracy and a corporation cannot conspire with itself. Since the officers, employees and agents of the corporation are considered a part of the corporation and their acts are the acts of the corporation, there can be no intracorporate conspiracy." Kendall Elevator Co. v. L B C & W Assoc. of South Carolina, Inc., 350 F.Supp. 75, 78 [D.S.C.1972].

See also Goldlawr, Inc. v. Schubert, 276 F.2d 614 [3rd Cir. 1960], Johnston y. Baker, 445 F.2d 424 [3rd Cir. 1971], and Allen Organ Co. v. North American Rockwell Corp., 363 F.Supp. 1117, 1128–1129 [E.D.Pa.1973].

"Surely discussions among those engaged in the management, direction and control of a corporation concerning the price at which the corporation will sell its goods, the quantity it will produce, the type of customers or market to be served, or the quality of goods to be produced do not result in the corporation being engaged in a conspiracy in unlawful restraint of trade under the Sherman Act. Plaintiff can come within the meaning of Section 1 of the Act only by claiming the existence of a conspiracy, but no conspiracy could possibly exist under the facts disclosed." Nelson Radio & Supply Co. Inc. v. Motorola, Inc., 200 F.2d 911, 914 [5th Cir. 1952].

The basic documents which control the relationship between plaintiff and defendant are entitled "Commission Manager Agreement". There were two of these in effect during the period covered by the complaint and they are substantially similar. The changes in the provisions in the second contract shifted responsibility for certain items of operating costs, but otherwise the differences are not material to the determination of the question presented. The printed contract recites that:

"*Employment.*

Boron hereby employs Manager to operate Boron's Gasoline Service Station . . . and Manager hereby accepts such employment on the terms and conditions herein set forth."

Nevertheless, it is plaintiff's contention that the paper designation of "employment" in the Commission Manager Agreement is not controlling and that the court must look beyond the terms of the agreement when it was used to cloak antitrust violations. The plaintiff has recited matters disclosed in the evidence to support his contention that he was an independent dealer. These factual matters involve the amount of working capital which the plaintiff was obliged to invest initially as well as the working capital which he was required to keep invested in order to continue to operate the gasoline station as a Commission Manager. This capital requirement arose because the plaintiff was obliged to pay the certain day-to-day operating expenses of the station, including the wages of any employees for a period of

six or seven weeks before he received his full commissions on sales from defendant company. The commissions were paid on all sales during a given month on the 25th day of the succeeding month. Plaintiff remitted the proceeds of sales of defendant's products to defendant at the close of each day's business, but was allowed to retain two cents for every gallon of gasoline sold, to apply against the full commission of 4.6¢ and 5.16¢ per gallon on regular and premium gasoline respectively.

In addition to the investment in working capital plaintiff claims a substantial investment in hand tools which were necessary for the auto mechanical service business which he was allowed to conduct on his own account at the service station under certain regulations and controls of prices charged by the defendant. Plaintiff also recites certain other elements of responsibility imposed on him under the agreement, the principal one of which is the hiring and payment of compensation of employees. His responsibilities also included the payment for insurance protection for his operations, including coverage of liabilities of the defendant arising thereunder, the paying for utility services under the first agreement which was shifted to defendant under the second agreement, the risk of loss for theft or employees' negligence which was later shifted to defendant under the second agreement and the like. The sum total of the evidentiary material argued by plaintiff in support of his contention that he was an independent businessman was that the plan imposed upon the plaintiff large risks and substantial managerial responsibilities which removed him from the status of an employee and constituted him an independent businessman.

On the other hand, the defendant claims that the arrangement under the Commission Manager Agreement constituted plaintiff an employee. Defendant cites the extensive control exercised by defendant over plaintiff's operation at the station, the extent of defendant's supervision over plaintiff to insure that he followed defendant's directives, the defendant's control of all major business decisions, the defendant's power to dismiss plaintiff at any time without cause, the fact that the major capital investment in the business enterprise was constituted by defendant's ownership of the gasoline station real estate and the major equipment installed therein, and that the risk of business competition in retail prices was borne by the defendant, the plaintiff receiving his commission on sales measured by the quantity of gasoline sold without regard to market price variations.

Both parties have indulged in an extensive recital of the presence or absence of indicia of status as an employee as opposed to that of an independent retailer. All of these indicia are not of equal weight in determining whether their relationship constituted a conspiracy to violate the antitrust laws. The indicia of status which may serve to impose vicarious liability on an employer for the negligent act of an alleged servant are not the same elements which should be controlling in a consideration of application of the antitrust laws.

Again, we return to Simpson v. Union Oil Co. of Cal., cit. supra, in connection with the tying agreement allegations of this case. The Court there examined the consignment sale agreement for the purpose of determining whether the agreement achieved a scheme of illegal price maintenance. The difficulty with the application of *Simpson* to the facts of the present case is that in *Simpson* the Court began its inquiry with the assumption that Simpson was an independent dealer. The Court then proceeded to inquire whether the form of the consignment agreement and the attendant circumstances were so coercive that they deprived independent dealers of the exercise of free judgment as to whether to become consignees at all, or to remain consignees, and ultimately deprived the independent dealers of free judgment to sell gasoline at competitive prices. The Court concluded that the agreement had the proscribed anti-competitive effect

and that to allow the defendant Union Oil Company to achieve a price fixing scheme over a vast area covered by its distribution system by means of this consignment device would be to make the scheme's legality for antitrust purposes turn on clever draftmanship.

■ Our consideration of *Simpson* leads us to conclude that the body of law developed by the line of master and servant cases from the state courts is of limited value in determining the master-servant issue in the price-fixing count of the instant case. The state cases are determined by the degree of control exercised by the master; if the master has the right to control not only the result of the work but also the way in which it will be accomplished, the relationship is one of employment. On the other hand, if the party engaged to do the work has the exclusive control of the manner of performing it, being responsible only for the result, then the performing party is held to be an independent contractor. This is the common law test as recognized in Singer Manufacturing Co. v. Rahn, 132 U.S. 518, 10 S. Ct. 175, 33 L.Ed. 440 [1889]. Both parties have pointed to abundant examples arising out of the instant commission manager agreement of the amount of supervision and control exercised by the defendant, as well as the individual responsibility placed upon the manager. It may be summarized by the statement that much responsibility was imposed upon the manager in the conduct of his station but that he was closely and extensively supervised by the defendant in almost every aspect of his performance of these duties. To the extent that the plaintiff was permitted to conduct his own business of mechanical service and repairs on the premises of defendant's gasoline station, the plaintiff exercised considerable independent responsibility, furnished his own hand tools and generally was unsupervised in the method in which he performed these services. However, the extent of the services which the plaintiff could offer and the prices which he charged for these services were under the control of the defendant. It is possible that under these circumstances the defendant would not be held vicariously liable for an act of negligence on the part of plaintiff in performing certain repair services whereas the defendant would be held liable for an act of negligence of the plaintiff in dispensing gasoline. We conclude, therefore, that the extent of control exercised by defendant over plaintiff in the operation of the gasoline station is not a factor to be accorded much weight in determining the existence of a conspiracy to fix prices in restraint of trade.

The gravamen of plaintiff's complaint with respect to the anti-trust violation of price fixing is directed to the sale of defendant's products in the gasoline station. Therefore, we focus attention on the aspects of the agreement and the conduct of the parties with respect to the sale of gasoline and the allied products and accessories supplied by the defendant for sale on the gasoline station premises.

There is no dispute that defendant established the prices at which all these products were to be sold. It is also established that the plaintiff's compensation for the sale of gasoline was not related to the retail price at which said gasoline was sold because the plaintiff was compensated on a fixed rate per gallon of gasoline dispensed. On the auxilliary products and accessories, however, the plaintiff was compensated on a percentage of retail sales prices.

It appears, however, that the sale of gasoline produced the substantial majority of the gross income received by the defendant from the operation of this station.

With respect to the sale of gasoline the plaintiff was not obliged to receive and distribute any particular amount in any given period of time. His inventory of gasoline and allied products would be restocked by the defendant upon the call of the plaintiff.

The plaintiff's only risk from price competition was that he might suffer a diminution in the quantity of gasoline sold from his station and hence a lessening of his fixed gallon commission, but the ordinary risk of the market was not placed upon him. The plaintiff was placed in a position of responsibility for risk of loss for shortages and employees' negligence under the original agreement but these risks were shifted to the defendant in the second agreement. Therefore, in the distribution of gasoline and allied products and accessories there is little evidence to substantiate the contention that the plaintiff is an independent dealer bound to a seller of gasoline by an agreement whose principal purpose is to restrain competition by fixing the prices at which the product should be sold. If in the sale of gasoline under the Commission Manager Plan the defendant company retains in its own hands the absolute price at which gasoline and related products are to be sold by those employed by it and the defendant continues to bear the major risks of the market place from that policy, we cannot find that the within contract is an agreement in restraint of trade by two independent parties engaged in that trade. The agreement is in no way coercive upon the individual operating the gasoline station; he is not bound to continue in that location by reason of a lease; he is not bound to continue the employment relationship which is one of employment at will of either party; he is not bound to buy a particular product in consideration of being allowed to purchase another product; he is in all senses for the purpose of distributing defendant's gasoline and related products an employee of the defendant producing company.

The plaintiff has recited a number of situations where the investment and the financial risk are imposed upon the plaintiff. The initial working capital requirement and the requirement of a continued working capital are present, but they are not disproportionate to the employment opportunity offered. The plaintiff is supplied with the premises free of an obligation to pay rent. The plaintiff must pay the expenses of keeping the location in operation although the second agreement shifts some of these expenses, i. e., utilities, to the defendant. Except for the two cents per gallon he is allowed to deduct immediately from the proceeds remitted daily to the company, the plaintiff is himself responsible for payment of his own wages and the wages of any employees he engages.

But the plaintiff is provided with premises and with the heavy equipment with which he may conduct mechanical service operations for his own account. He thus enjoys the benefits of defendant's investment in the location and the heavy equipment without substantial financial risk to himself, except for his investment in his hand tools. Under all of the circumstances we hold that the indicia of capital investment and risk of loss do not indicate that plaintiff must be considered an independent contractor. The working capital investment and the risks of loss which plaintiff must assume under the Commission Manager Agreement are not incompatible with a contract of employment.

### PLAINTIFF'S COUNT II

Plaintiff's Count II of the complaint is based upon a contention that under the applicable law of the state the contract between the parties was unconscionable and, therefore, void, and that the plaintiff's termination was unfair, without cause and therefore illegal. Jurisdiction is based on diversity of citizenship. Although this count also involves determination of plaintiff's employment status it requires a consideration of elements other than those considered in determining plaintiff's status under the antitrust laws. The defendant asserts that plaintiff can only allege the cause of action in Count II on the assumption that plaintiff was an employee of defendant and that the same considerations must be viewed in determining his employment as were made in

considering the existence of an agreement or conspiracy between independent parties under the Sec. 1 Sherman Act price fixing violation alleged in Count I. We think other criteria are also to be viewed for the purpose of determining plaintiff's status under Count II of the complaint. In Count I we searched for the antitrust effect of the agreement; in Count II we are concerned with the effect of the agreement between the parties. Plaintiff resists the defendant's allegation that the relationship of employer and employee must be assumed for the purpose of Count II because defendant argues that the relationship between the parties was that of a joint venture which requires the application of fiduciary standards to determine the effect of relations between them.

Plaintiff's argument, and the evidentiary materials that he has produced and cited in support of it, is that the amount of initial and continuing monetary investment in the enterprise by the plaintiff and the risks that he assumed in the operation removed him from the category of an employee to that of a joint venture. We have given some weight to these arguments for the purpose of determining the plaintiff's status under the price fixing allegation in Count I but we are now concerned with viewing the same evidence not from the point of view of the antitrust implications of their relationship but rather the common law indicia of the agreement between them.

Plaintiff argues that the parties were engaged in a common enterprise for mutual profit. We cannot find this argument sufficient to establish a joint enterprise because all contracts of employment, and in fact all commercial transactions, involve the same ultimate expectation. Plaintiff advances the joint enterprise theory because of the doctrine that a joint enterprise cannot be terminated by either party except for good cause. The good cause argument has also been raised in Count III of the plaintiff's complaint. We will consider the nature of the good cause requirement in our discussion of Count III of the complaint but its injection into Count II of the complaint depends upon a finding of a joint venture.

■ We have found no case authority either state or federal which converts an employer-employee relationship established as such in a written agreement to a joint venture on the grounds of the allocation of the alleged employee's investment or the sharing of risks between them. The plaintiff has cited one case from New Jersey involving an independent gasoline dealer operating under a franchise agreement with a separate written agreement for the lease of the station premises. A termination of the franchise agreement and a cancellation of the lease was resisted by the operator on the grounds that the reasons given by the oil company did not constitute good cause in that the grounds given did not demonstrate the failure of the dealer to substantially comply with his obligations under the lease and dealer agreement. Involved in Shell Oil Company v. Marinello, 63 N.J. 402, 307 A.2d 598 [1973], was the statutory policy of the state of New Jersey expressed in its Franchise Practices Act. Under that statute good cause was a requirement for any cancellation of a franchise. The existence of a lease coterminous with the franchise was an added element in that case. There is no similar statutory provision in Pennsylvania whose law controls the interpretation of the present contract and under the Pennsylvania Uniform Commerical Code, Sec. 2–309(2), in the absence of any controlling contractual provision, agreements calling for successive performance may be terminated by either party without cause.

■ Thus, we can find no authority for construing the present agreement which on its face constitutes a contract of employment into that of a joint venture so that its provision for termination became subordinate to an independent determination of good cause. Nothing in this contract or nothing in the controlling law applicable to the contract limits the rights of termination given to

either party by the express language of the contract.

Summary judgment on Count II must be rendered for the defendant.

### PLAINTIFF'S COUNT III

Plaintiff's allegation in Count III of the complaint is also asserted under diversity jurisdiction and involves a question of state law in the interpretation of the agreement between the parties. In brief it recites that defendant terminated its relationship with the plaintiff because of his failure to be open for business on Christmas Day 1971, contrary to the orders of the company. The agreement in effect at the time of termination was the agreement made May 1, 1969. It provides:

"8. Termination.

A. This Agreement and Manager's employment hereunder may be terminated without cause by either Boron or Manager at any time upon not less than two (2) weeks' prior notice given to the other party."

Section (B) of clause 8 provides for termination of the agreement by Boron without notice for certain causes recited therein. These are not material to our present consideration because it is not disputed here that the defendant gave the two weeks' notice required by Section (A) for termination without cause.

Plaintiff's contention that the termination is void and without cause again relies on assertion that the contract under consideration was not a contract of employment but one which established him as an independent contractor. The defendant asserts that it is a contract of employment and is governed by the well-established principle of law that a contract of employment without a definite term is a contract for employment at will which permits of discharge at any time in the absence of specific provisions to the contrary.

As in Count II, so also in Count III, we examine the indicia of the relationship between the parties from the point of view of general common law principles for determining the relationship of master and servant and individual contractors. We are not limited to those indicia that are of importance in determining the antitrust effect of the relationship between the parties. Here we begin with a written contract of employment which states the relationship as that of employer and employee. One of the controlling qualities of a contract establishing the relationship of employer and employee is the right of the parties to terminate the relationship at will.

"[A]n extremely important consideration is the power of the master to terminate the relationship at any time with or without cause, since that tends strongly to show that the person employed is not an independent contractor but a servant." Feller v. New Amsterdam Cas. Co., 363 Pa. 483, 487, 70 A.2d 299, 301 [1950].

and

"[T]he power of an employer to terminate the employment at any time is incompatible with the full control of the work which is usually enjoyed by an independent contractor, and hence is considered as a strong circumstance tending to show the subserviency of the employee." Blum Unemployment Compensation Case, 163 Pa.Super. 271, 276, 60 A.2d 568, 570 [1948].

Not only does the understanding of the parties as they set it forth in the written contract between themselves provide for termination without cause which is a strong indicator of the nature of the relationship between them but also the contract itself is cast in the terms of an employer-employee relationship. The Restatement of the Law, Agency 2d, 220(2)(i) sets forth as a factor to be considered in determining the relationship;

"(i) whether or not the parties believe they are creating the relation of master and servant;".

However, we are dealing with a contract between the parties which provides that it may be terminated by either party upon notice. It is undisputed that

the notice was given for the time required. We conclude that it is immaterial whether we determine this to be a contract of employment or a franchise agreement constituting an independent contractor's status. The express terms of the contract in either event provide for termination. There are no elements here such as a lease for the premises for a stated term which would restrict either party's absolute right to terminate at any time upon notice. Therefore, whether we label this as a contract of employment or a contract for an independent dealership is immaterial to the disposition of Count III of the complaint.

■ The general rule governing such contracts in Pennsylvania is stated as follows:

"The general rule is that when a contract provided that one party shall render services to another, or shall act as an agent, or shall have exclusive sales rights within certain territory, but does not specify a definite time or prescribe conditions which shall determine the duration of the relation, the contract may be terminated by either party at will." Cummings v. Kelling Nut Co., 368 Pa. 448, 451, 84 A.2d 323, 325 [1951].

If this is a contract of hiring the law is clear that unless otherwise specified it is terminable at will by either party regardless of cause. See Fawcett v. Monongahela Ry. Co., 391 Pa. 134, 139; 137 A.2d 768 [1958]; Trainer v. Laird, 320 Pa. 414, 183 A. 40 [1936], but whether it is labeled a contract of employment or one creating an independent relationship is immaterial because the express terms of the contract provided for its own termination and no facts in this case support any rule of law which would place a limitation on such right of termination at any time. In view of these facts we believe that it is unnecessary to consider the additional undisputed fact that the defendant relied upon a specific refusal of the plaintiff to follow orders as a cause for this dismissal. We do not find

any cause necessary under the law and the terms of this agreement, but were we to so inquire the cause has been stated and would in our minds satisfy any requirement of cause under the circumstances of this case.

■ Therefore, under Count III of the complaint we find that the plaintiff fails to state a cause of action and that Summary Judgment must be granted for defendant.

Finally, in view of the evidentiary matters presented, we must establish the power of this court to determine the above questions under Fed.R.Civ.P. 56 as a summary judgment.

■ We recognize that where a case depends on the resolution of conflicting inferences of fact which may be drawn from undisputed terms of a writing summary judgment is improper. See, e. g., Aetna Casualty & Surety Co. v. Giesow, 412 F.2d 468 [2nd Cir. 1969] and Lemelson v. Ideal Toy Corp., 408 F. 2d 860 [2nd Cir. 1969]. We also recognize that summary judgment is inappropriate where motive and intent are important or where credibility is a factor. United States v. Beatrice Foods Co., 344 F.Supp. 104 [D.C.Minn.1972], supplemented 351 F.Supp. 969.

Although a jury trial was demanded in plaintiff's complaint both parties have moved for summary judgment on all counts, and both have submitted extensive evidentiary matter in the form of depositions, affidavits and documents. The court has had the benefit of evidence to the same extent that it would in a plenary trial of the issue except for the actual production of witnesses before it. However, no question of credibility has been raised with respect to the depositions of oral testimony. Some objection has been noted as to the lack of proof of authentication of certain documents, but not as to the essential documents, the agreements upon which the suit is based.

■ In none of the counts in the instant complaint are intent or credibility

in question. The price-fixing and tying agreement allegations of Count I depend entirely on the terms of the Commission Manager Agreement and not on questions of relevant product line, intent to monopolize or the like. The question of plaintiff's status in Counts II and III is also for the court. Where the facts are not in dispute the issue of whether the employer-employee relationship exists may be determined as a matter of law. McGrath v. Edward G. Budd Mfg. Co., 348 Pa. 619, 36 A.2d 303 [1944].

While the counsel have argued different conclusions from the evidentiary material we do not believe that this creates a material issue of fact. The court is faced with the interpretation of a written contract which is clear and unambiguous as to its terms. The conflicting conclusions argued are to its antitrust effect and to the nature of the relationship between the parties. See Allen-Bradley Co. v. Air Reduction Co. Inc., 273 F.Supp. 930 [W.D.Pa.1967], aff'd p. c. 391 F.2d 282 [3rd Cir. 1968].

Our holding on each of the three counts of the Complaint rests on our construction of the Commission Manager Agreements. The cases indicate that the construction and the legal effect of an unambiguous writing is for the court and not for a jury. Holmes v. Chartiers Oil Co., 138 Pa. 546, 21 A. 231 [1891]; Rhoads v. Rhoads, 126 Pa.Super. 141, 190 A. 533 [1937]; United States v. Manufacturers Casualty Ins. Co., 158 F.Supp. 319 [D.C.N.Y.1957]. Summary judgment is properly used for interpreting a contract whose terms are considered by opposing parties to be clear and unambiguous, despite the parties' divergent views of what the agreement provided. Green v. Valve Corp. of America, 428 F.2d 342 [7th Cir. 1970]; Trans-Fuel, Inc. v. Saylor, 440 Pa. 51, 269 A.2d 718 [1970]. Summary judgment, if otherwise justified, is clearly proper in antitrust cases. Lee National Corp. v. Atlantic Richfield Co., 308 F. Supp. 1041 [D.C.Pa.1970] United States v. Krasnov, 143 F.Supp. 184 [D.C.Pa. 1956], aff'd. 355 U.S. 5, 78 S.Ct. 34, 2

L.Ed.2d 21 [1957]; Crest Auto Supplies, Inc. v. Ero Mfg. Co., 360 F.2d 896 [7th Cir. 1966]; Ingram v. Phillips Petroleum Co., 252 F.Supp. 674 [D.C.N.M. 1966].